John M. Peebles (Cal. Bar No. 237582)
Patrick R. Bergin (Cal. Bar No. 269672)
Michael A. Robinson (Cal. Bar No. 214666)
Tim Hennessy (Cal. Bar No. 233595)
Steven J. Bloxham (Cal. Bar No. 96384)
Curtis Vandermolen (Cal. Bar No. 338366)
PEEBLES KIDDER BERGIN & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone: (916) 441-2700
Fax: (916) 441-2067
Email: jpeebles@ndnlaw.com

*Attorneys for Plaintiff*
BIG SANDY BAND OF WESTERN MONO INDIANS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIG SANDY BAND OF WESTERN MONO INDIANS, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>vs.<br><br>GAVIN NEWSOM, Governor of the State of California; and the STATE OF CALIFORNIA,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

Comes now Plaintiff, BIG SANDY BAND OF WESTERN MONO INDIANS, (the "Tribe" or "Big Sandy"), a.k.a. Big Sandy Rancheria of Western Mono Indians of California, a federally recognized Indian tribe, by and through its undersigned counsel, and complains of the Defendants, GAVIN NEWSOM, Governor of the State of California, and the STATE OF CALIFORNIA (collectively "the State") as follows:

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 2

JURISDICTION ............................................................................................................. 5

PARTIES ....................................................................................................................... 6

INTRODUCTION .......................................................................................................... 6

GENERAL ALLEGATIONS .......................................................................................... 8

I.   Big Sandy. ............................................................................................................ 8

II.  The Indian Gaming Regulatory Act. ................................................................... 9

   A.   General Provisions. ......................................................................................... 9

   B.   The Tribal-State Compacting Process. ......................................................... 11

   C.   The Secretary's Authority to Review Tribal-State Compacts. ..................... 12

   D.   The Secretary's Interpretation of IGRA Under Section 2710(d)(8)(C). .... 12

   E.   The Scope of the Secretary's Authority to Prescribe Gaming Procedures. .. 14

   F.   Consequences of Gaming Without an Effective Tribal-State Compact. ...... 16

III.  The State's Demand for Revenue Sharing Provisions in 1999 and Subsequent Compacts. .................................................................................................................. 16

   A.   The Revenue Sharing Trust Fund: Direct Payments to Non-Gaming Indian Tribes. . 17

   B.   The Special Distribution Fund: Compensation to the State for the Negative Externalities of Indian Gaming. ........................................................................... 19

   C.   The Tribal Nation Grant Fund: A New Fund Providing the State With Discretionary Control to Set Priorities for Tribal Governments. ........................ 19

IV.  The State's Pattern and Practice of Including Prohibited Provisions in Tribal-State Gaming Compacts. .................................................................................................... 20

   A.   The Secretary Determined that California Tribal-State Compact Provisions for Environmental Regulations Not Directly Related to the Operation of Gaming Activities Are Impermissible. ............................................................................... 21

   B.   The Secretary Determined that California Tribal-State Compact Provisions that Impose Taxes, Fees, Charges or Other Assessments on Indian Tribes Are Impermissible. .. 24

C.    The Secretary Determined that California Tribal-State Compact Provisions Regulating Food and Beverage Service and Water Quality Are Impermissible.................. 25

D.    The Secretary Determined that California Tribal-State Compact Provisions Requiring Intergovernmental Agreements with Local Governments Are Impermissible. ... 26

E.    The Secretary Determined that California Tribal-State Compact Provisions Regulating Tribal Liability for Torts Not Directly Related to the Operation of Gaming Activities Are Impermissible. ........................................................................................ 27

F.    California's Disregard of the Secretary's Determinations that the State's Compacts Violate IGRA. ........................................................................................................ 27

G.    The Secretary's Interpretation of IGRA is Entitled to *Chevron* Deference. ............. 29

H.    The State is Bound by the Secretary's Decisions and Determinations of Issues Necessarily Decided in those Decisions. ................................................................. 31

V.    Chronology of Compact Negotiations Between Big Sandy and the State. .................... 31

A.    Initial Request to Negotiate with the State. ............................................................. 31

B.    Negotiations with the State Through a Tribal Coalition............................................ 32

C.    Direct Negotiations with the State.......................................................................... 33

D.    Unlawful Compact Provisions the State Seeks to Impose on Big Sandy – Regulatory Provisions........................................................................................... 50

E.    Unlawful Compact Provisions the State Seeks to Impose on Big Sandy – Taxes, Fees, Charges or Other Assessments. ..................................................................... 55

VI.    Big Sandy's Efforts to Develop Class III Gaming on the McCabe Allotment. ............. 58

VII.    Extension of the 1999 Compact. .............................................................................. 70

VIII.    The State's Conduct Harms Big Sandy..................................................................... 72

FIRST CLAIM FOR RELIEF ............................................................................................ 73

Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand to Negotiate a Tribal-State Compact that Cannot be Affirmatively Approved by the Secretary ............................................................................................................ 73

SECOND CLAIM FOR RELIEF ....................................................................................... 74

Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demands for Unlawful Compact Provisions .................................................................. 74

COMPLAINT

THIRD CLAIM FOR RELIEF ............................................................................... 75

Failure to Negotiate in Good Faith in Violation of 25 U.S.C. §§ 2710(d)(3) and 2710(d)(4): The State's Demands for Revenue Sharing and Attempts to Impose a Prohibited Tax, Fee, Charge, or Other Assessment upon Big Sandy ...................................................... 75

FOURTH CLAIM FOR RELIEF ......................................................................... 76

Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand for Tribal-State Compact Provisions that Require Big Sandy to Enter into Separate Intergovernmental Agreements ............................................................ 76

FIFTH CLAIM FOR RELIEF ............................................................................. 77

Refusal to Negotiate and Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Refusal to Negotiate for Class III Gaming on the McCabe Allotment ............................................................................................................ 77

SIXTH CLAIM FOR RELIEF.............................................................................. 78

Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Tactic of Delay and Deadlines........................................................................... 78

REQUEST FOR RELIEF ................................................................................... 80

## JURISDICTION

1.      This action arises out of the State's refusal to negotiate or failure to conduct negotiations with Big Sandy in good faith for the purpose of entering into a Tribal-State compact in violation of the Indian Gaming Regulatory Act ("IGRA"), Pub. L. 100-497 (Oct. 17, 1988), 102 Stat. 2467-88, codified as amended at 25 U.S.C. §§ 2701-2721 and 18 U.S.C. §§ 1166-1168, as hereinafter more fully appears.

2.      This Court has jurisdiction over the subject matter of this action pursuant to: (a) 28 U.S.C. § 1331 (federal question action), in that this is a civil action arising under the Constitution, laws or treaties of the United States; (b) 28 U.S.C. § 1362 (federal question action brought by an Indian tribe), in that this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior ("Secretary") and the matter in controversy arises under the Constitution, laws or treaties of the United States; and (c) 25 U.S.C. § 2710(d)(7)(A)(i) (state's failure to negotiate in good faith under IGRA), in that this is an action initiated by an Indian tribe arising from the failure of a state to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under IGRA or to conduct such negotiations in good faith.

3.      This action arises under the Constitution and laws of the United States, as hereinafter more fully appears, including but not limited to: the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3; the Supremacy Clause, U.S. Const. Art. VI, cl. 2; IGRA, 25 U.S.C. §§ 2701-2721; the Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the federal common law.

4.      The State has waived its sovereign immunity from suit in this action, in that it has waived such immunity in the federal courts with respect to any action brought against the State by a federally-recognized Indian tribe asserting any cause of action arising from the State's refusal to enter into negotiations with that tribe for the purpose of entering into a Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith.  Cal. Gov't Code § 98005.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 84 and 1391(b)(1) and (2), as each of the defendants herein reside in the Eastern District of California, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

**PARTIES**

6.     Plaintiff BIG SANDY BAND OF WESTERN MONO INDIANS, a.k.a. Big Sandy Rancheria of Western Mono Indians of California, is a federally recognized Indian tribe, *see* Indian Entities Recognized…, 87 Fed. Reg. 4636, 4637 (Jan. 28, 2022) ("Big Sandy Rancheria of Western Mono Indians of California"), with principal offices on the Big Sandy Rancheria, 37387 Auberry Mission Rd., Auberry, CA 93602.  Big Sandy is organized under a Constitution in accordance with 25 U.S.C. § 5123(h), which establishes the Big Sandy Tribal Council as the governing body of Big Sandy.  Big Sandy is recognized by the Secretary for the special programs and services provided by the United States to Indians because of their status as Indians and is recognized as possessing the power of self-government.  87 Fed. Reg. at 4637.

7.     Defendant GAVIN NEWSOM is the duly elected Governor of the State of California, with principal offices at 1021 O Street, Suite 9000, Sacramento, CA 95814.  The Governor is authorized to negotiate and conclude Tribal-State compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games, by federally recognized Indian tribes on Indian lands in California in accordance with IGRA.  Cal. Const. Art. IV, § 19(f).  Gavin Newsom is sued herein in his official capacity.

8.     Defendant the STATE OF CALIFORNIA is a state of the United States of America.

**INTRODUCTION**

9.     The State has violated IGRA by failing to negotiate with Big Sandy in good faith to enter into a Tribal-State compact governing the conduct of class III gaming activities on the Indian lands within Big Sandy's jurisdiction.  The State has attempted to impose Tribal-State compact provisions on Big Sandy that violate IGRA, either or both because such provisions are not directly related to the operation of gaming activities and because they constitute prohibited taxes, fees, charges, or other assessments, all without an offer of meaningful concessions as consideration.  These provisions are referred to herein as "Unlawful Compact Provisions."  Big

Sandy has requested to negotiate these Unlawful Compact Provisions to bring them into compliance with IGRA, but the State has refused to negotiate, or failed to negotiate in good faith.

10. The Secretary has not affirmatively approved a Tribal-State compact from California since 2004, with only three exceptions – a unique 2013 Tribal-State compact in which the tribe agreed to forgo all class III gaming activities on its Indian lands and, in 2016, partial amendments to two Tribal-State compacts the Secretary had not affirmatively approved.

11. Since 2004, the Secretary has found more than sixty California Tribal-State compacts and compact amendments unsuitable for affirmative approval because they contain Unlawful Compact Provisions that violate IGRA. The Secretary has repeatedly warned the State that it must narrowly interpret the State's overbroad Tribal-State compact provisions, or read such provisions out entirely, in order for the compacts to take effect consistent with IGRA. The State has sought to impose the same unapproved Tribal-State compact provisions on Big Sandy. Finally, in November 2021, the Secretary disapproved three California Tribal-State compacts because, *inter alia*, they included the Unlawful Compact Provisions. Regardless, the State has continued to attempt to impose the same disapproved Unlawful Compact Provisions on Big Sandy. When Big Sandy asked the State to alter or eliminate the disapproved Unlawful Compact Provisions in order to comply with IGRA, the State refused.

12. Further, the State has refused to negotiate a Tribal-State compact that allows Big Sandy to operate a gaming facility on its Indian lands including the "McCabe Allotment," which is a parcel of Indian land eligible for gaming under IGRA. IGRA requires the State to negotiate for class III gaming on Big Sandy's Indian lands, including the McCabe Allotment.

13. The State has also attempted to impose Unlawful Compact Provisions upon Big Sandy and limit Big Sandy's right to conduct class III gaming on its Indian lands, by unduly delaying and prolonging compact negotiations while simultaneously pushing Big Sandy toward a State-imposed deadline to agree to the Unlawful Compact Provisions.

14. Big Sandy seeks an order pursuant to 25 U.S.C. § 2710(d)(7)(B) directing the State to conclude a Tribal-State compact with Big Sandy that complies with IGRA within 60 days.

**GENERAL ALLEGATIONS**

**I.     Big Sandy.**

15.     In 1909, under the authority of the Act of April 30, 1908, ch. 153, 35 Stat. 70, 77, the United States purchased land to hold in trust for the benefit of a band of Western Mono Indians who lived in the area of Auberry and along the San Joaquin River on the western slope of the Sierra Nevada mountains.  The land became known as the Big Sandy Rancheria, and the Auberry Band became known as the San Joaquin Band or Big Sandy Band of Indians, the Big Sandy Rancheria of Western Mono Indians of California, and now the plaintiff Big Sandy Band of Western Mono Indians.

16.     The United States also acquired additional allotted parcels between about 1891 and 1920 to hold in trust for the benefit and use of approximately forty members of Big Sandy.  The vast majority of these Indian allotments were made within twelve miles of the Big Sandy Rancheria.

17.     Among these allotments was the parcel granted posthumously to Mary McCabe in 1920, now called the "McCabe Allotment."  *See* United States Land Patent to Mary McCabe (Mar. 29, 1920) (Record of Negotiations ("RON") Tab 295.  True and complete copies of the documents comprising the RON are attached to the Complaint and incorporated herein by reference.)  The McCabe Allotment is located approximately ten miles southwest of the Big Sandy Rancheria.  The McCabe Allotment is, and always has been, held in trust by the United States for the benefit of its Indian owner(s).

18.     On August 18, 1958, Congress enacted the California Rancheria Act, P.L. 85-671, 72 Stat. 619, later amended by the Act of August 11, 1964, P.L. 88-419, 78 Stat. 390-391, authorizing the termination of the trust status of the lands and the Indian status of the people of forty-one California rancherias, including the Big Sandy Rancheria.  Although the United States took steps to terminate Big Sandy, including distributing Big Sandy Rancheria lands to individual owners, the government failed to provide the improvements and services required under the California Rancheria Act, and as a result the United States never validly terminated Big Sandy.

19.     On July 16, 1983, Big Sandy and the United States entered into a settlement agreement and stipulated judgment in a federal lawsuit brought by Big Sandy to undo the effects

of the invalid termination.  *See* Judgment and Stipulation for Entry of Judgment, *San Joaquin or Big Sandy Band of Indians v. Watt*, No. C-80-3787-MHP (June 13, 1983); Big Sandy Rancheria, California; Distribution Plan, 49 Fed. Reg. 1140, 1140-41 (Jan. 9, 1984) (RON Tab 296).  Under the settlement agreement, "[t]he exterior boundaries of the Big Sandy Rancheria… are reestablished, as is the status of said lands as Indian country within the meaning of 18 U.S.C. § 1151."  The agreement also authorized all fee land that had previously been an Indian allotment or Rancheria property to be restored to its status as Indian country.

## II.    The Indian Gaming Regulatory Act.

### A.    General Provisions.

20.    Before the adoption of IGRA, states had no civil regulatory authority over tribal gaming activities in Indian country.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  IGRA, however, allowed states to play a role in the regulation of "Las Vegas-style" gaming through the good faith negotiation of Tribal-State compacts with Indian tribes, but strictly limited state authority to seven permissible subjects of negotiation.  IGRA also set forth standards to preserve tribal control over gaming activities, including an express declaration of IGRA's purposes; a structure that allocates jurisdiction among the federal government, Indian tribes, and the states; a strict limitation on states' authority to tax tribal gaming activities; and the obligation imposed on states to negotiate Tribal-State compacts in good faith.  State demands to address prohibited topics in a Tribal-State compact or otherwise contravene IGRA's purposes constitute a failure to negotiate in good faith in violation of IGRA.

21.    Congress, when adopting IGRA, found in part that numerous Indian tribes were engaged in or had licensed gaming activities on Indian lands as a means of generating tribal governmental revenue and that a principal goal of federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government.  25 U.S.C. §§ 2701(1) & (4).

22.    The purpose of IGRA was to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency and strong tribal government, to provide a statutory basis for the regulation of gaming by an Indian tribe

adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe was the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players.  25 U.S.C. §§ 2702(1) & (2).

23.    IGRA established independent federal regulatory authority for gaming on Indian lands, established federal standards for gaming on Indian lands, and established the National Indian Gaming Commission ("NIGC") to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.  25 U.S.C. § 2702(3).

24.    IGRA divided gaming into three classes.  Class I gaming consists of social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations.  25 U.S.C. § 2703(6).  Class II gaming consists of bingo (regardless of whether electronic, computer, or other technological games are used in connection therewith) including (if played at the same location) pull tabs, lotto, punchboards, tip jars, instant bingo, and other games similar to bingo, and non-banked card games that are explicitly authorized by the laws of the State or are not explicitly prohibited by the laws of the State and are played at any location in the State.  25 U.S.C. § 2703(7)(A).  Class III gaming is defined as all forms of gaming that are not class I gaming or class II gaming.  25 U.S.C. § 2703(8).

25.    IGRA authorizes class III gaming on Indian lands only if the class III gaming activities are authorized by a tribal ordinance or resolution, located in a state that permits such gaming for any purpose by any person, organization, or entity, and conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state.  25 U.S.C. § 2710(d)(1).

26.    IGRA defines Indian lands as all lands within the limits of any Indian reservation; and any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by an Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.  25 U.S.C. § 2703(4).

27.     IGRA requires an Indian tribe proposing to engage in, or to authorize any person or entity to engage in, class III gaming activity on Indian lands of the Indian tribe, to adopt and submit to the Chairman of the NIGC an ordinance or resolution that meets the requirements of IGRA. 25 U.S.C. § 2710(d)(2)(A).  The Chairman of the NIGC shall approve any class III gaming ordinance or resolution described in IGRA unless the Chairman specifically determines that the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe.  25 U.S.C. § 2710(d)(2)(B).  Upon approval of the ordinance or resolution, the Chairman shall publish in the Federal Register the ordinance or resolution and the order of approval.  25 U.S.C. § 2710(d)(2)(B).  Effective with the publication of a tribe's NIGC-approved class III gaming ordinance or resolution in the Federal Register, class III gaming activity on Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact entered into pursuant to IGRA.  25 U.S.C. § 2710(d)(2)(C).

## B.     The Tribal-State Compacting Process.

28.     An Indian tribe having jurisdiction over the Indian lands upon which class III gaming activities are being conducted, or are to be conducted, shall request the state in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of class III gaming activities.  25 U.S.C. § 2710(d)(3)(A).  Upon receiving such a request, the state shall negotiate with the Indian tribe in good faith to enter into such a compact. 25 U.S.C. § 2710(d)(3)(A).

29.     Any Tribal-State compact negotiated pursuant to IGRA may only include provisions relating to: (1) the application of criminal and civil laws and regulations of the Indian tribe or the state that are directly related to, and necessary for, the licensing and regulation of class III gaming activity; (2) the allocation of criminal and civil jurisdiction between the state and the Indian tribe necessary for the enforcement of such laws and regulations; (3) the assessment by the state of such activities in such amounts as are necessary to defray the costs of regulating such class III gaming activity; (4) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the state for comparable activities; (5) remedies for breach of contract; (6) standards for the operation of class III gaming activities and maintenance of the gaming facility,

including licensing; and (7) any other subjects that are directly related to the operation of class III gaming activities. 25 U.S.C. § 2710(d)(3)(C). All other provisions in a Tribal-State compact under IGRA are unlawful. *See Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1028-29 (9th Cir. 2010); *Fort Independence Indian Community v. California*, 679 F.Supp.2d 1159, 1172 (E.D. Cal. 2009); *North Fork Rancheria of Mono Indians of Cal. v. California*, 2015 WL 1148206, *9 (E.D. Cal. 2015).

30.    Except for assessments by the state of class III gaming activities in such amounts as are necessary to defray the costs of regulating the Indian tribe's gaming activity, nothing in IGRA shall be interpreted as conferring upon the state or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in class III gaming activities. 25 U.S.C. § 2710(d)(4). No state may refuse to enter into negotiations described in IGRA based upon the lack of authority in such state, or its political subdivisions, to impose such a tax, fee, charge, or other assessment. 25 U.S.C. § 2710(d)(4).

### C.    The Secretary's Authority to Review Tribal-State Compacts.

31.    The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a state governing class III gaming on the tribe's Indian lands. 25 U.S.C. § 2710(d)(8)(A). The Secretary may disapprove a compact only if the compact violates the provisions of IGRA, any other provision of federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligation of the United States to Indians. 25 U.S.C. § 2710(d)(8)(B). If the Secretary does not affirmatively approve or disapprove a compact within forty-five days of its submission to the Secretary for approval, the compact is considered to have been approved by the Secretary (a "Deemed Approved" compact), but only to the extent that the compact is consistent with IGRA. 25 U.S.C. § 2710(d)(8)(C).

### D.    The Secretary's Interpretation of IGRA Under Section 2710(d)(8)(C).

32.    As contemplated by Congress, Section 2710(d)(8)(C) was an action-forcing mechanism to ensure that Tribal-State compacts would not languish before the Secretary.

33.     As implemented by the Secretary since the turn of the century, Section 2710(d)(8)(C) is used by the Secretary to "Deem Approved" Tribal-State compacts that the Secretary determines do not fully comply with IGRA.  Because Section 2710(d)(8)(C) provides that Deemed Approved compacts are only approved to the extent they are consistent with IGRA, the Secretary uses this tool to avoid disapproving a Tribal-State compact that contains unlawful provisions, so that the Indian tribe may conduct gaming.

34.     After deciding to use Section 2710(d)(8)(C), the Secretary often publishes an analysis of the Tribal-State compact provisions which the Secretary has determined violate IGRA. The Secretary's analysis is provided to the state and the Indian tribe, and published with the Tribal-State compact.  These letters are hereafter referred to as "Deemed Approved Letters."

35.     Each Deemed Approved Letter is not an exhaustive list of provisions in the Tribal-State compact that violate IGRA.  Rather, the Secretary's Deemed Approved Letters analyze parts of the Tribal-State compact while expressing general principles that should be applied broadly.

36.     The Secretary's Deemed Approved Letters explain to the state and the Indian tribe that certain provisions of the Tribal-State compact are not consistent with IGRA and are therefore not approved under Section 2710(d)(8)(C).  The Deemed Approved Letters typically contain language similar to that in the Secretary's 2013 Deemed Approved Letter regarding the Shingle Springs Tribal-State compact:

> Nothing in IGRA or its legislative history indicates that Congress intended to allow gaming compacts to be used to expand state regulatory authority over tribal activities that are not directly related to the conduct of Class III gaming.  To the extent that it is implemented in such a way, it is not lawful.  Thus, although we decline to use our authority to disapprove the Amended Compact in total, we caution the parties that, in implementing this Amended Compact, they should avoid applying its provisions in a manner that does not directly relate to the operation of gaming activities, and

thus avoid the violation of IGRA regarding the limited scope of tribal-state gaming compacts.

37.    In some instances, the Secretary's Deemed Approved Letters have narrowed how the parties to a Tribal-State compact may implement compact provisions.  In other instances, Deemed Approved Letters have expressly disapproved Tribal-State compact provisions.  For example, in the Secretary's 2012 Deemed Approved Letter regarding the Graton Rancheria Tribal-State compact:

> We have also determined that Section 12.3(a),(b) of the Compact attempts to regulate activities outside the scope of those prescribed under 25 U.S.C. § 2710(d)(3)(c), and are inconsistent with IGRA's requirement that class III gaming compacts regulate those activities which are "directly related to the operation of gaming activities"… we have decided to permit the Compact to take effect by operation of law, but only to the extent it is consistent with IGRA, and subject to our understanding of the actual implementation of the Compact described above.

38.    These Deemed Approved Letters are the culmination of reasoned agency action by the Secretary and are entitled to deference under the Supreme Court's *Chevron* doctrine.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

### E.    The Scope of the Secretary's Authority to Prescribe Gaming Procedures.

39.    An Indian tribe may initiate a cause of action against a state arising from the failure of the state to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact or to conduct such negotiations in good faith.  25 U.S.C. § 2710(d)(7)(A)(i), (B)(i).

40.    Upon the introduction of evidence by an Indian tribe that (a) a Tribal-State compact has not been entered into and (b) the state did not respond to the request of the Indian Tribe to negotiate such a compact or did not respond to such request in good faith, the burden of proof shall be upon the state to prove that the state has negotiated with the Indian tribe in good faith to

conclude a Tribal-State compact governing the conduct of class III gaming activities.  25 U.S.C. § 2710(d)(7)(B)(ii).

41.    The court may take into consideration, when making a determination whether the state carried its burden of proof that it negotiated in good faith, the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities and shall consider any demand by the state for direct taxation of the Indian tribe or of any Indian lands as evidence that the state has not negotiated in good faith.  25 U.S.C. § 2710(d)(7)(B)(iii).  The state may not expand the permissible subjects of negotiation under 25 U.S.C. § 2710(d)(3)(C) by applying these factors.

42.    If the court finds that the state failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of class III gaming activities, the court shall order the state and the Indian tribe to conclude a compact within sixty days.  25 U.S.C. § 2710(d)(7)(B)(iii).  If the state and Indian tribe fail to conclude a Tribal-State compact governing the conduct of Indian gaming activities on the Indian lands subject to the jurisdiction of the Indian tribe within the sixty-day period provided in the order of the court, the Indian tribe and the state shall submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact.  The mediator shall select from the two proposed Tribal-State compacts the one which best comports with the terms of IGRA, any other applicable federal law, and with the findings and order of the court.  25 U.S.C. § 2710(d)(7)(B)(iv).

43.    The mediator appointed by the court shall submit to the state and the Indian tribe the compact selected by the mediator.  25 U.S.C. § 2710(d)(7)(B)(v).  If the state consents to the proposed compact within sixty days, the proposed compact shall be treated as a Tribal-State compact entered into pursuant to IGRA.  25 U.S.C. § 2710(d)(7)(B)(vi).

44.    If the state refuses to consent to the mediator's selected compact, the Secretary is granted broad authority to prescribe procedures governing the Indian tribe's gaming activities ("Secretarial Procedures").  25 U.S.C. § 2710(d)(7)(B)(vii).  In practice, only a compact proposed by the Indian tribe would become the foundation for Secretarial Procedures because a state would

consent to its own proposal.  The Secretary's procedures must be "consistent with" (a) the Indian tribe's proposed compact, (b) IGRA, and (c) the "relevant provisions" of state law.  25 U.S.C. § 2710(d)(7)(B)(vii)(I).  The Secretary must consult with the Indian tribe, but the state—having already refused to act in good faith to enter into a Tribal-State compact at least three times—is excluded from the Secretary's process.  25 U.S.C. § 2710(d)(7)(B)(vii).

45.  The Secretary is not bound by IGRA's limits on state negotiations when prescribing Secretarial Procedures.  The seven subjects of negotiation under Section 2710(d)(3)(C) expressly apply only to the State's good faith negotiations.  25 U.S.C. §§ 2710(d)(3)(C) & 2710(d)(3)(A).  Instead, the Secretary is guided primarily by the Indian tribe's needs and the broad purposes of IGRA.  25 U.S.C. §§ 2702(1) & (2).

### F.    Consequences of Gaming Without an Effective Tribal-State Compact.

46.  Under IGRA's criminal provisions, state laws pertaining to the licensing, regulation, or prohibition of gambling apply to class III gaming conducted in Indian country without a valid Tribal-State gaming compact.  18 U.S.C. § 1166.  The United States has exclusive jurisdiction to prosecute violations of state gambling laws in Indian country.  *Id.*  IGRA also provides that the federal prohibition against the possession and use of gambling devices within Indian country, under 15 U.S.C. § 1175, does not apply to gaming conducted under a Tribal-State gaming compact that is in effect.  25 U.S.C. § 2710(d)(6).  Thus, an Indian tribe that operates class III gaming on its Indian lands without an approved Tribal-State compact in effect is subject to federal prosecution for violation of federal and state gambling laws.

### III.    The State's Demand for Revenue Sharing Provisions in 1999 and Subsequent Compacts.

47.  In September 1999, fifty-seven California Indian tribes, including Big Sandy, concluded the first effective Tribal-State compacts for class III gaming in California (the "1999 Compacts").  *See* Cal. Gov't Code § 12012.25 (ratifying 57 compacts).

48.  The 1999 Compacts were identical in substance because the State imposed uniformity on the compacting Indian tribes.  Such an imposition was warranted at the time, because

the State was under no obligation to conclude Tribal-State compacts based on then-existing State law.

49.     The 1999 Compacts were all affirmatively approved by the Secretary and published in the Federal Register on May 16, 2000, at 65 Fed. Reg. 31189.

50.     Under Section 11.2.1(a) of the 1999 Compact, Big Sandy is entitled to negotiate a new Tribal-State compact beginning on June 30, 2019, eighteen months before the expiration of its 1999 Compact on December 31, 2020.  *See* 1999 Compact, § 11.2.1(a), as modified by Modification No. 4 (RON Tab 316).

51.     The 1999 Compacts contained provisions for two types of revenue sharing.  The Revenue Sharing Trust Fund ("RSTF") shared tribal gaming revenues with non-gaming tribes and tribes with small gaming operations.  The Special Distribution Fund ("SDF") shared tribal gaming revenues with the State, to be used by the State for defraying the costs of implementing the Tribe's compact, and other specified purposes directly related to the Indian tribe's gaming activities.

### A.     The Revenue Sharing Trust Fund: Direct Payments to Non-Gaming Indian Tribes.

52.     In the 1990's when Big Sandy and other California Indian Tribes began negotiating Tribal-State compacts to govern the conduct of class III gaming on Indian lands within the State, no Las Vegas-style gambling was allowed in the State of California.  The State was under no obligation to negotiate for Tribal-State compacts under IGRA that would allow Indian tribes to offer the most attractive forms of class III gaming, slot machines and house-banked card games. *See generally In re Indian Gaming Related Cases* ("*Coyote Valley II*"), 331 F.3d 1094 (9th Cir. 2003).

53.     The State agreed to advocate for the passage of Proposition 1A in its November 1999 statewide election to amend the California Constitution and exclusively authorize Indian tribes to operate slot machines and conduct lottery games and banking and percentage card games within the State.

54.     In exchange for these substantial and meaningful concessions, Big Sandy and the other Indian tribes agreed to provisions in the 1999 Compacts that created the RSTF, and the tribes

proposed these provisions to the State.  Under the 1999 Compacts, revenues paid by Big Sandy and the other Indian tribes to the RSTF could only be used to pay each "Non-Compact Tribe" one million one hundred thousand dollars ($1,100,000) per year.  *See* 1999 Compact, § 4.3.2.1 (RON Tab 316).  No other use of RSTF money was permitted.  *Id.*  The State was given "no discretion with respect to the use or disbursement of the [RSTF] trust funds."  *Id.*

55.    The RSTF was a permitted subject of negotiation because it was (a) directly related to the operation of class III gaming activities, (b) consistent with the purposes of IGRA, and (c) bargained for in exchange for a meaningful concession.  *See Coyote Valley II*, *supra*; *Rincon*, *supra*, 602 F.3d at 1032-33.

56.    The 1999 Compact directly addresses the substantial value of the State's meaningful concession: "The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California.  The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues."  *See* 1999 Compact, Preamble at (E) (RON Tab 316); *see also Rincon* at 1036 ("Just how 'meaningful' the exclusivity provision … was at the time of the 1999 compacts cannot be overstated.  In 1999, the California constitution prohibited casino-style gaming, and the State was therefore under no obligation to allow tribes to conduct it, or even negotiate concerning it.").

57.    As is the case with contracts generally, the meaningful concessions used by the State as consideration are exhausted at the end of the compact and cannot be used in future negotiations.  *Id.* at 1037 (holding that "exclusivity is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law").

### B.    The Special Distribution Fund: Compensation to the State for the Negative Externalities of Indian Gaming.

58.    The 1999 Compacts also established the SDF.  Under the 1999 Compacts, the SDF was financed out of the tribes' net win from their operation of slot machines, or "gaming devices," and SDF deposits were available for appropriation by the Legislature for the following purposes: (a) grants for programs designed to address gambling addiction; (b) grants for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the California Gambling Control Commission and California Department of Justice in connection with the implementation and administration of the Indian tribe's compact; (d) payment of shortfalls that may occur in the RSTF; and (e) other purposes specified by the Legislature.  *See Coyote Valley II*, *supra*, at 1105-06; 1999 Compact, §§ 5.1, 5.2 (RON Tab 316).

### C.    The Tribal Nation Grant Fund: A New Fund Providing the State With Discretionary Control to Set Priorities for Tribal Governments.

59.    In addition to the RSTF and SDF provisions that Indian tribes offered in exchange for the 1999 Compacts, a decade later beginning with the Graton Rancheria Tribal-State compact signed in May 2012, the State established the TNGF.  Unlike the SDF and RSTF, the TNGF was not proposed by all compacting Indian tribes and was not negotiated with all compacting Indian tribes.

60.    According to the legislative analysis, the TNGF "was created… as a new destination for gaming revenue… the TNGF was created to complement the RSTF… According to the Governor's office, the TNGF reflects a vision of facilitating the development of tribal institutions and improving the quality of life of tribal people throughout the State of California." *See* Assemb. Comm. On Governmental Org., Rep. on AB 1916 (2014) (RON Tab 317).

61.    The State exercises discretionary control over the distribution of money from the TNGF to one or more non-gaming or limited-gaming Indian tribes based on competitive applications and criteria established by the State.  *See* Cal. Gov't Code §§ 12019.30 *et seq*.  Thus, unlike the RSTF, Indian tribes are subject to State control over their receipt of TNGF funds and

their use of such funds, according to the State's policies and priorities for tribal institutions and tribal people.

### IV.    The State's Pattern and Practice of Including Prohibited Provisions in Tribal-State Gaming Compacts.

62.    The State of California has engaged in a long and consistent pattern and practice of demanding that Indian tribes agree to Tribal-State compact provisions that violate IGRA.  Since the Secretary affirmatively approved the initial group of sixty-one California Tribal-State compacts in 2000, the State has submitted seventy-nine more Tribal-State compacts and compact amendments to the Secretary for approval.  The Secretary affirmatively approved only twelve of them.

63.    Since 2004, the Secretary affirmatively approved only one California Tribal-State compact, in which the Indian tribe agreed not to conduct any gaming on its Indian lands, and two minor compact amendments which amended Deemed Approved compacts.  Meanwhile, the Secretary refused to affirmatively approve sixty-one California Tribal-State compacts and compact amendments and allowed them only to be Deemed Approved because their provisions violated IGRA.  As used hereafter, "compact" includes compacts and compact amendments.  The Secretary disapproved six California Tribal-State compacts outright, including three in November 2021.

64.    Four times, the State's failure to negotiate a Tribal-State compact with an Indian tribe in good faith resulted in the issuance of Secretarial Procedures.

65.    In twenty-five separate letters from the Secretary to the State, either disapproving Tribal-State compacts or accompanying Deemed Approved compacts, the Secretary described the numerous provisions of the Tribal-State compacts that violate IGRA, as a result of which the Secretary would not affirmatively approve the Tribal-State compacts.

66.    Between 2004 and 2020, the Secretary declined to affirmatively approve forty-two California Tribal-State compacts and compact amendments containing provisions that violate IGRA, without issuing accompanying analysis.  Twenty-one of these Tribal-State compacts were Deemed Approved in this manner between 2018 and 2020.

**A.   The Secretary Determined that California Tribal-State Compact Provisions for Environmental Regulations Not Directly Related to the Operation of Gaming Activities Are Impermissible.**

67.    Between 2008 and 2020, the Secretary refused to affirmatively approve a total of fifty-six California Tribal-State compacts and compact amendments containing environmental regulation provisions that violated IGRA.  The Secretary wrote detailed analyses of these compact provisions in letters to the State and each affected Indian tribe for nineteen of these fifty-six Deemed Approved Tribal-State compacts, explaining that the Tribal-State compacts' environmental provisions, in combination with the definitions of the terms Gaming Facility, Project, and in some cases Gaming Operations, were unlawful under IGRA.  The Secretary expressed "significant concern that the [Tribal-State compacts] allow the State to regulate areas that are not directly related to gaming." *See, e.g.*, Letter from Kevin K. Washburn, Assistant Sec'y – Indian Affairs, to Nick Fonesca, Chairman, Shingle Springs Band of Miwok Indians (July 13, 2013) (RON Tab 230)*.*  Among other provisions, the Secretary stated "significant concerns about whether Section 11 [environmental regulations] of the Amended Compact… exceeds the scope of provisions tribes and states may include in a Class III gaming compact under IGRA." *Id.*  The Secretary's concerns stemmed from the compact's overbroad definition of the terms Gaming Facility and Project.  To avoid disapproving the Tribal-State compacts, the Secretary chose to "interpret these provisions as applying only to spaces in which gaming actually takes place, to spaces in which gaming-related funds or devices are kept, to spaces in which other activities directly related to gaming occur, and to spaces occupied or frequented by employees who work within the confines of the gaming operation." *Id.*

68.    These Secretarial letters addressing overbroad definitions and unlawful environmental provisions accompanying Deemed Approved Tribal-State compacts are: **2011** Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, to Sherry Treppa Bridges, Chairperson, Habematolel Pomo of Upper Lake (Aug. 31, 2011) (RON Tab 232), **2012** Letters (1) from L. Echo Hawk to Leona Williams, Chairwoman, Pinoleville Pomo Nation (Feb. 9, 2012) (RON Tab 234) and (2) from Donald E. Laverdure, Acting Assistant Sec'y – Indian Affairs, to Greg Sarris, Chairman, Federated Indians of Graton Rancheria (Jul. 13, 2012) (RON Tab 235),

**2013** Letter from K. Washburn to N. Fonesca, *supra*, **2014** Letters from K. Washburn to (1) Anthony R. Pico, Chairman, Viejas Group of Capitan Grande Band of Mission Indians (Dec. 1, 2014) (RON Tab 236) and (2) Russell Attebery, Chairman, Karuk Tribe (Nov. 12, 2014) (RON Tab 237), **2015** Letters from K. Washburn to (1) Adam Dalton, Chairperson, Jackson Band of Miwok Indians (Oct. 16, 2015) (RON Tab 238), (2) Vincent P. Armenta, Chairman, Santa Ynez Band of Chumash Mission Indians (Dec. 17, 2015) (RON Tab 239), (3) Cody J. Martinez, Chairman, Sycuan Band of the Kumeyaay Nation (Dec. 17, 2015) (RON Tab 240), and (4) Gene Whitehouse, Chairman, United Auburn Indian Community (Dec. 16, 2015) (RON Tab 241), **2016** Letter from Lawrence S. Roberts, Principal Dep'y Assistant Sec'y – Indian Affairs, to Robert J. Welch, Jr., Chairman, Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians (Oct. 21, 2016) (RON Tab 243), and **2017** Letters from John Tahsuda, Principal Dep'y Assistant Sec'y – Indian Affairs to (1) Chris Wright, Chairman, Dry Creek Rancheria Band of Pomo Indians (Dec. 15, 2017) (RON Tab 242), (2) Robert Martin, Chairman, Morongo Band of Mission Indians (Dec. 15, 2017) (RON Tab 245), (3) Keeny Escalanti, Sr., President, Quechan Tribe (Dec. 15, 2017) (RON Tab 246), (4) Lynn R. Valbuena, Chairwoman, San Manuel Band of Mission Indians (Dec. 15, 2017) (RON Tab 247), (5) Neil Peyron, Chairman, Tule River Indian Tribe (Dec. 15, 2017) (RON Tab 248), (6) Kevin A. Day, Chairman, Tuolumne Band of Me-Wuk Indians (Dec. 15, 2017) (RON Tab 249), (7) G. Whitehouse (Dec. 15, 2017) (RON Tab 244), and (8) Raymond C. Hitchcock, President, Wilton Rancheria (Dec. 15, 2017) (RON Tab 250)).

69.    The Secretary's analysis of the 2014 Karuk Tribe Tribal-State compact in 2014 expressly rejected the State's attempt to apply environmental regulations to "a parking lot or parking structure in which no class III gaming will be conducted." *See* Letter from K. Washburn to R. Attebery, *supra*.

70.    The Secretary's analysis of the Jackson Band Tribal-State compact in 2015 expressly rejected the State's use of the "principal purpose" test to determine whether the subject of regulation was permitted under IGRA. The "principal purpose" test, the Secretary determined, is "broader than IGRA's requirement that compacts may regulate only those activities that are

'directly related to the operation of gaming activities.'" *See* Letter from K. Washburn to A. Dalton, *supra*. The Secretary also disapproved the State's use of the "principal purpose" test in his response to the 2015 Tribal-State compacts with the Santa Ynez Band, the Sycuan Band and the United Auburn Indian Community. *See* Letters from K. Washburn to V. Armenta, C. Martinez and G. Whitehouse, respectively, *supra*. The Secretary distinguished between "more general concerns that would accompany any type of development," which violate IGRA, and "unique regulatory concerns related to the operation of gaming," which are permitted by IGRA. *See also* Letter from D. Laverdure to G. Sarris, *supra* (disapproving the "but for" test).

71. The Secretary's analysis of the 2017 Tribal-State compacts continued to narrowly interpret the environmental provisions and the definitions of Gaming Facility and Project to avoid disapproving the compacts. The Secretary stated that "these provisions must be interpreted to apply only to spaces in which gaming actually takes place, to spaces in which gaming-related funds or devices are kept, to spaces in which other activities directly related to gaming occur, and to spaces occupied or frequented by employees who work within the confines of the gaming operation." More specifically, the Secretary explained that "the provisions cannot lawfully apply to hotel rooms and hotel-related spaces… [or] businesses or amenities that are ancillary to gaming activities… To do so would violate the express provisions of IGRA that limit the scope of tribal-state gaming compacts and would, therefore, be unlawful." *See*, *e.g.*, Letter from J. Tahsuda to G. Whitehouse, *supra*.

72. Finally, in November 2021, the Secretary disapproved three Tribal-State compacts because they contained the impermissible environmental regulations that the Secretary previously identified, and that the State continued to impose on Indian tribes. *See* Letter from Brian Newland, Assistant Sec'y – Indian Affairs, to Claudia Gonzales, Chairwoman, Picayune Rancheria of Chukchansi Indians (Nov. 5, 2021) (RON Tab 257), Letter from B. Newland to Leo Sisco, Chairman, Santa Rosa Indian Community (Nov. 23, 2021) (RON Tab 258), and Letter from B. Newland to Jose Simon III, Chairman, Middletown Rancheria of Pomo Indians (Nov. 23, 2021) (RON Tab 259).

### B.    The Secretary Determined that California Tribal-State Compact Provisions that Impose Taxes, Fees, Charges or Other Assessments on Indian Tribes Are Impermissible.

73.    Shortly after the Ninth Circuit Court of Appeals held in *Rincon* that the State violated IGRA by using a Tribal-State compact to impose a tax on the Indian tribe, the State submitted on July 6, 2010, a Tribal-State compact with the Habematolel Pomo of Upper Lake to the Secretary for approval.  The Secretary disapproved the compact because "the State impose[d] a tax, fee, charge, or other assessment on a tribally-owned gaming facility in violation of IGRA…." *S*ee Letter from L. Echo Hawk to S. Treppa (Aug. 17, 2010) (RON Tab 231).

74.    The Secretary disapproved the State's Tribal-State compact with the Pinoleville Pomo Nation in 2011 for the same reason.  *See* Letter from L. Echo Hawk to L. Williams (Feb. 25, 2011) (RON Tab 233).

75.    In 2012, the State resubmitted a Tribal-State compact with the Pinoleville Pomo Nation to the Secretary.  Again, the Secretary refused to affirmatively approve the compact because it imposed taxes, fees, charges, or other assessments that violated IGRA.  After allowing the compact to be Deemed Approved, the Secretary issued a letter to the State describing the provisions which were not approved by operation of law.  The Secretary stated: "if the Tribe were to operate more than 600 gaming devices, the effective revenue sharing rate provided for in the Compact may be excessive."  The Secretary did not disapprove the compact because he found "that the market in the Tribe's location is likely not conducive to the Tribe reaching the top effective revenue sharing rate…."  *See* Letter from L. Echo Hawk to L. Williams (Feb. 9, 2012), *supra*.

76.    In 2016, the State submitted a Tribal-State compact with the Viejas Band of Kumeyaay Indians to the Secretary.  After allowing the compact to be Deemed Approved, the Secretary issued a letter to the State describing the provisions which were not approved by operation of law.  In addition to other Unlawful Compact Provisions discussed elsewhere, the Secretary expressed concern "that the State is funding units of State government by including them within the Compact without analyzing whether their inclusion or the activities they actually carry out are justified as directly related to, and necessary for, the licensing and regulation of tribal

gaming." *See* Letter from L. Roberts to R. Welch, *supra* (RON Tab 243). The Secretary also "questioned the State's methodology of allocating the tribe's regulatory costs by appropriation rather than by reference to actual costs," in part because the State was using tribal gaming funds to pay the cost of litigating whether Indian tribes could conduct class III gaming on their Indian lands. *Id*. The Secretary cautioned the State "that in implementing the Compact, [the State] should not apply its provisions in a manner that does not directly relate to the operation of gaming activities." *Id*. The Secretary described a similar concern in his response to the 2015 Tribal-State compacts with the Santa Ynez Band, the Sycuan Band and the United Auburn Indian Community wherein he stated: "We are concerned that the State is funding units of State government by including them within the Compact without analyzing whether their inclusion or the activities they actually carry out are justified as directly related to, and necessary for, the licensing and regulation of tribal gaming." *See* Letters from K. Washburn to V. Armenta, C. Martinez and G. Whitehouse, respectively, *supra*.

### C.    The Secretary Determined that California Tribal-State Compact Provisions Regulating Food and Beverage Service and Water Quality Are Impermissible.

77.    In 2012, the State submitted a Tribal-State compact with the Federated Indians of Graton Rancheria to the Secretary for approval. After allowing the compact to be Deemed Approved, the Secretary issued a letter to the State describing the provisions which were not approved by operation of law. In addition to noting concerns about the overbroad environmental provisions, the Secretary also stated that "Section 12.3(a),(b) of the Compact attempts to regulate activities outside the scope of those prescribed under [IGRA]… The State's interest in regulating the Tribe's food, beverage, and drinking water services do not fall within the scope of [section 2710(d)(3)(C)(vii)], and are not within the range of state interests that Congress sought to protect when it enacted IGRA." *See* Letter from D. Laverdure to G. Sarris, *supra*.

**D. The Secretary Determined that California Tribal-State Compact Provisions Requiring Intergovernmental Agreements with Local Governments Are Impermissible.**

78.    In 2021, the State submitted substantially identical Tribal-State compacts with the Picayune Rancheria of Chukchansi Indians, the Santa Rosa Indian Community, and the Middletown Rancheria of Pomo Indians to the Secretary for approval.  The Secretary described the long history of objections to the State's imposition of Unlawful Compact Provisions in class III gaming activities on Indian lands, and disapproved all three compacts.  *See* Letters from B. Newland to C. Gonzales (RON Tab 257), L. Sisco (RON Tab 258), and J. Simon III (RON Tab 259).  These letters are referred to in this Complaint as the "Disapproval Letters."

79.    As part of the environmental review process prescribed in the Santa Rosa compact, the compact required Santa Rosa to enter into agreements with the State's local governments to provide mitigation for each tribal Project.  The compact prohibited Santa Rosa from constructing or renovating a Gaming Facility before agreement with the local government, or binding arbitration with the local government, was completed.  The Secretary disapproved the requirement for an intergovernmental agreement, stating: "the requirement to enter into an intergovernmental agreement prior to commencement or construction of a project provides local governments an effective veto over an on-reservation Tribal project.  Therefore, these provisions, as written, fall outside of the narrow range of topics IGRA permits in a compact and must be disapproved."  (RON Tab 258); *see also* Letter from K. Washburn to N. Fonesca, *supra* (RON Tab 230), Letter from L. Echo Hawk to S. Treppa Bridges, *supra* (RON Tab 232), Letter from B. Newland to C. Gonzales (RON Tab 257), and Letter from B. Newland to J. Simon III (RON Tab 259).

80.    The Secretary's draft regulations, published March 28, 2022, further emphasize that "[a]ll compacts, amendments, agreements, or other documents – including, but not limited to, any dispute resolutions, settlement agreements, or arbitration decisions – which establish, change, or interpret the terms and conditions for the operation and regulation of a Tribe's class III gaming activities… must be submitted for review and approval by the Secretary."  *See* Consultation Draft, Part 293—Class III Tribal-State Compact (Mar. 28, 2022) (RON Tab 260, proposed 25 C.F.R. § 293.4(a)).

### E.    The Secretary Determined that California Tribal-State Compact Provisions Regulating Tribal Liability for Torts Not Directly Related to the Operation of Gaming Activities Are Impermissible.

81.    The disapproved Tribal-State compacts of the Picayune, Middletown, and Santa Rosa Rancherias each contained provisions that required the Indian tribe to adopt a tort claims ordinance covering tort claims "arising out of, connected with, or relating to the operation of the Gaming Operation, the Gaming Facility, or the Gaming Activity."  As a result of this expansive language and the provision's incorporation of broadly-defined terms, each of the Secretary's 2021 Disapproval Letters stated, "We are highly concerned with the State requiring the Tribe to adopt a tort claim ordinance that could be interpreted to apply to more than just activity directly related to gaming."  *See* Letters from B. Newland to C. Gonzales (RON Tab 257); L. Sisco (RON Tab 258), and J. Simon III (RON Tab 259).

### F.    California's Disregard of the Secretary's Determinations that the State's Compacts Violate IGRA.

82.    Since no later than 2008, the Secretary has consistently, repeatedly, and increasingly objected to unlawfully expansive provisions in California's Tribal-State compacts.

83.    The Secretary disapproved, severed or narrowly interpreted Unlawful Compact Provisions based on the Secretary's interpretations of IGRA.  Specifically, the Secretary determined that:

A.    The State's definitions for Gaming Facility, Gaming Operation, and Project are impermissibly broad and include subjects that are not directly related to class III gaming activity.

B.    The State's use of those definitions in the environmental provisions of its Tribal-State compacts exceeds the permissible subjects of negotiation under IGRA.

C.    The State's use of a "but for" or "principal purpose" test is not permitted under IGRA, which requires that the permissible subjects of negotiation be directly related to the operation of class III gaming activities.

D.    The State's demand to regulate areas of a Gaming Facility outside of where gaming actually takes place, gaming-related funds or devices are kept, or other activities

directly related to gaming occur, is not a permissible subject of negotiation under IGRA.

E.    The State's demand that a tribe share revenues from its gaming activities exceeding the amounts necessary to defray the State's costs of regulating the tribe's class III gaming activities is an impermissible tax, fee, or other assessment that violates IGRA.

F.    The State's calculation of the cost of regulating a tribe's class III gaming activities based on legislative appropriations instead of the "actual costs, necessary and directly related to regulating gaming" is an impermissible tax, fee, or other assessment that violates IGRA.

G.    The State's demand to regulate food and beverage service is not a permissible subject of negotiation under IGRA.

H.    The State's demand to regulate water quality is not a permissible subject of negotiation under IGRA.

I.    The State's demand that tribes enter into agreements with local governments as a condition prior to conducting class III gaming, thereby enabling local governments to impose unspecified and unreviewed conditions on such gaming, is not a permissible subject of negotiation under IGRA.

J.    The State's demand to regulate tribal liability for torts that are not directly related to the operation of gaming activities is not a permissible subject of negotiation under IGRA.

84.    On March 28, 2022, Governor Newsom announced that he signed revised Tribal-State compacts with Santa Rosa Indian Community and Middletown Rancheria of Pomo Indians. These revised compacts are substantially the same as the compacts the Secretary disapproved in 2021. *See* Tribal-State Compact Between the State of California and the Middletown Rancheria of Pomo Indians (executed Mar. 24, 2022) (RON Tab 292); Tribal-State Compact Between the

State of California and the Santa Rosa Indian Community (executed Mar. 24, 2022) (RON Tab 293).

### G.    The Secretary's Interpretation of IGRA is Entitled to *Chevron* Deference.

85.    Congress has charged the Secretary with the administration of Indian affairs generally, 25 U.S.C. §§ 2, 9, and the review of Tribal-State compacts under IGRA in particular, *id.* § 2710(d)(8).

86.    Exercising that authority, the Secretary reviews Tribal-State compacts for violations of IGRA, 25 U.S.C. § 2710(d)(8)(B)(i), including whether the compact includes provisions relating to matters beyond the scope of negotiable subjects as set forth in 25 U.S.C. § 2710(d)(3)(C).

87.    Section 2710(d)(3)(C) contains standards which Congress did not precisely define, including the phrase "directly related." 25 U.S.C. § 2710(d)(3)(C)(i) ("directly related to, and necessary for, the licensing and regulation of such [class III gaming] activity"); *id.* § 2710(d)(3)(C)(vii) ("other subjects that are directly related to the operation of gaming activities"). Congress did not define, for instance, how attenuated the relationship between the subject of the compact and the operation of gaming activities may be while remaining direct. The Secretary therefore construes these statutory terms in light of Congress's intent based on the purposes of IGRA, its legislative history, and other considerations, when making a decision to approve or disapprove a Tribal-State compact, or to disapprove or limit certain compact provisions in a Deemed Approved Letter.

88.    Under IGRA, the Secretary's decisions carry the force of law, as Secretarial approval is needed to permit class III gaming activities. The Secretary's interpretation of IGRA's Tribal-State compact provisions are a key part of a comprehensive and detailed regulatory scheme. The Secretary's decisions and interpretation are made public to inform other interested parties about the accepted interpretation of IGRA's provisions, and they carry precedential value for subsequent Secretarial decisions.

89.     On March 28, 2022, the Secretary issued a Consultation Draft of proposed revisions to 25 C.F.R. Part 293 governing the class III gaming compact process under IGRA.  *See* Consultation Draft (RON Tab 260).  The Department's draft regulations reflect its prior consistent statements about the Unlawful Compact Provisions.  Among other revisions, the Department's new regulations:

A.     Define "gaming activities" to mean the conduct of class III gaming involving the three required elements of chance, consideration, and prize.

B.     Define "gaming facility" to mean the space within a building where the gaming activity occurs and the spaces necessary for conduct of gaming.

C.     Provide that every document which establishes, changes, or interprets the terms and conditions for the operation and regulation of a Tribe's class III gaming activities must be submitted to the Department for approval as a class III gaming compact or compact amendment.

D.     Require that a State must show the actual expenses for regulating a specific Tribe's gaming activity when demanding payments to defray the cost of regulating class III gaming activities.

E.     State that all provisions of a compact or compact amendment must be directly related to the operation of gaming activities.  The State and the Tribe must show a direct connection between the subject regulated and the Tribe's conduct of class III gaming activities.

90.     Once adopted, the Secretary's regulations will also be due deference by the Court. Until then, the Court should consider the draft regulations as persuasive evidence that the Secretary intended to, and did, establish a comprehensive regulatory scheme that applied broadly to all Indian tribes through the systematic publication of Deemed Approved Letters.

91.     The Secretary's reasonable interpretation of IGRA in Disapproval Letters and Deemed Approved Letters is entitled to *Chevron* deference in court, and the Secretary's reasonable interpretation also necessarily sets the governing standard for the State's good faith negotiation of

a Tribal-State compact. The State's negotiations that disregard the Secretary's reasonable interpretation of IGRA are not conducted in good faith.

### H.    The State is Bound by the Secretary's Decisions and Determinations of Issues Necessarily Decided in those Decisions.

92.    The Secretary's Disapproval Letters and Deemed Approved Letters are each the product of a regular, robust and fair adjudicatory decision-making process governed substantively by IGRA, with opportunities for the State to litigate its views before the Secretary, and ultimately the opportunity for the State to commence an action for judicial review of the Secretary's decision under the Administrative Procedure Act. 5 U.S.C. § 702.

93.    To date, the State has not sought judicial review of any Disapproval Letter or Deemed Approved Letter. The six-year statute of limitations for seeking such review has expired with respect to many of the decisions. Each Disapproval Letter and Deemed Approval Letter for a California Tribal-State compact is a valid final judgment of whether such compact violates IGRA, or provisions of such compact are inconsistent with IGRA.

94.    The Secretary's determinations in Disapproval Letters and Deemed Approved Letters regarding the permissible subject matter of a Tribal-State compact are essential to the Secretary's decision to disapprove a compact because it violates IGRA, or to allow it to be Deemed Approved except to the extent it is inconsistent with IGRA.

95.    The State is precluded from relitigating any such issue decided by the Secretary in a Disapproval Letter or Deemed Approved Letter.

96.    The State's negotiations that disregard the Secretary's final decisions and the determination of issues necessarily decided therein are not conducted in good faith.

### V.    Chronology of Compact Negotiations Between Big Sandy and the State.
### A.    Initial Request to Negotiate with the State.

97.    Big Sandy first requested that the State enter into negotiations for a Tribal-State compact to amend or replace its 1999 Compact over fourteen years ago, no later than April 9, 2008. *See* Letter from Rory E. Dilweg, Att'y, Big Sandy, to Andrea Lynn Hoch, Legal Affs. Sec'y, Off. of the Governor (Apr. 9, 2008) (RON Tab 3); Letter from R. Dilweg to A. Hoch (Oct. 15,

2008) (RON Tab 5); Letter from A. Hoch to R. Dilweg (Nov. 13, 2008) (RON Tab 6). Discussions in 2008 between Big Sandy and the State focused on the gaming eligibility of the McCabe Allotment, the site on which Big Sandy intended to develop a new gaming facility. These discussions are detailed in Part VI, below, as part of the State's ongoing refusal to allow Big Sandy to conduct gaming on the McCabe Allotment.

### B.    Negotiations with the State Through a Tribal Coalition.

98.    On May 8, 2014, by letter to the State, Big Sandy requested that the State enter into good faith negotiations conclude a new Tribal-State compact to replace the 1999 Compact. *See* Letter from Elizabeth D. Kipp, Chairperson, Big Sandy, to Jerry Brown, Governor (May 8, 2014) (RON Tab 8).

99.    Big Sandy sought to begin conducting gaming compact negotiations with the State through a coalition of federally recognized California Indian tribes, the Compact Tribes Steering Committee ("CTSC"). *Id*.

100.    By reply letter dated May 27, 2014, the State initially declined the request to negotiate a replacement to the 1999 Compact. *See* Letter from Joginder S. Dhillon, Senior Advisor for Tribal Negots., Off. of the Governor, to E. Kipp (May 27, 2004) (RON Tab 11).

101.    On July 22, 2014, by letter to the State, Big Sandy provided the State a list identifying issues to address in negotiations with the State, including (among others) the deletion of provisions unrelated to the regulation and/or licensing of class III gaming, the definition of the terms "Gaming Facility" and "Project," the payment to the State of amounts necessary to defray its costs of regulating Big Sandy's class III gaming activity, and maintaining the solvency of the RSTF. *See* Letter from E. Kipp to J. Dhillon (July 22, 2014) (RON Tab 12).

102.    In the course of the negotiations, the State insisted that the CTSC Indian tribes include in their respective compacts subjects that are not authorized by IGRA. These improper subjects included provisions requiring that: (1) the CTSC Indian tribes recognize and enforce State court spousal support orders against all tribal employees; (2) the CTSC Indian tribes recognize and enforce State court child support orders against all tribal employees; (3) the CTSC Indian tribes comply with California's minimum wage law and regulations; (4) the CTSC Indian tribes fund a

grant fund for other California Indian tribes; (5) the CTSC Indian tribes assess, and provide for the negotiation of agreements with local governments to mitigate, impacts on the "off-reservation" environment caused by the construction and/or operation of facilities and parts of facilities in which no class III gaming activities occur; (6) the CTSC Indian tribes, as a precondition to commencing the construction of a facility whose principal purpose is to serve class III gaming, negotiate and enter into binding and enforceable agreements with nearby local governments to mitigate a broad spectrum of perceived impacts and to submit to binding arbitration issues upon which the Indian tribes and local governments cannot agree; (7) the CTSC Indian tribes comply with regulations that are not directly related to the operation of gaming activities because they are tied to overbroad definitions of such terms as Gaming Facility, Gaming Operation, and Project; (8) the CTSC Indian tribes waive exemptions established by Congress that exempt Indian tribes from the requirements of federal anti-discrimination laws, and which require the CTSC Indian tribes to adopt and enforce prohibitions against employment discrimination, retaliation and harassment, and establish money damages remedies against the CTSC Indian tribes when such prohibited conduct occurs; and (9) the CTSC Indian tribes adopt and enforce tribal laws relating to employee working hours, wages and working conditions which include employees engaged in tasks not directly related to the operation of class III gaming activity.

103.    Big Sandy left the CTSC in 2016 to negotiate directly with the State.

## C.    Direct Negotiations with the State.

104.    On March 2, 2018, by letter to the State, Big Sandy again requested that the State negotiate a Tribal-State compact. *See* Letter from John M. Peebles, Att'y, Big Sandy, to J. Dhillon (Mar. 2, 2018) (RON Tab 14).

105.    The State responded by letter to Big Sandy on March 28, 2018, stating it was not under any obligation to enter into negotiations, but that it was willing to discuss issues relating to potential future negotiations. *See* Letter from J. Dhillon to J. Peebles (Mar. 28, 2018) (RON Tab 16).

106.    On April 26, 2018, Big Sandy and the State met to discuss procedures for the Tribal-State compact negotiations.

107.    On May 1, 2018, the State sent Big Sandy a draft Tribal-State compact for discussion that included Unlawful Compact Provisions the State had imposed in previous compacts with other Indian tribes.  *See* E-mail from Jennifer T. Henderson, Cal. Deputy Att'y Gen., to J. Peebles (May 1, 2018, 5:48 p.m.) (RON Tab 33); Draft Tribal-State Compact, "Big Sandy Compact State's opening draft May 1, 2018 for discussion" (RON Tab 34).

108.    On August 2, 2018, by letter to the State, Big Sandy requested a meeting to chart a course for compact negotiation.  *See* Letter from J. Peebles to J. Dhillon (Aug. 2, 2018) (RON Tab 35).

109.    On September 19, 2018, Big Sandy and the State met to discuss procedures for the compact negotiations.

110.    On October 12, 2018, the State informed Big Sandy in writing that it would "defer negotiations for a new compact until the new gubernatorial administration is in place."  The State characterized this as a joint decision by Big Sandy and the State.  *See* Letter from J. Dhillon to E. Kipp (Oct. 12, 2018) (RON Tab 51).  A few months prior, in June of 2018, the State had informed the CTSC Indian tribes that, if they wanted to conclude a gaming compact in 2018 with the current Governor, the Indian tribes were required to include provisions in their compacts that IGRA prohibits and, if the CTSC Indian tribes refused to do so, that: (1) they would have to wait until the new Governor was elected in November and took office and then request that the new Governor resume gaming compact negotiations; and (2) there would be no guarantee that the new Governor would agree to be bound by the provisions on which the parties had already reached agreement.

111.    On January 8, 2019, the day after Governor Newsom took office, by letter to the State, Big Sandy renewed its request to negotiate a Tribal-State compact.  *See* Letter from E. Kipp to Gavin Newsom, Governor (Jan. 8, 2019) (RON Tab 53).  Big Sandy provided the State a proposed Tribal-State compact based on its 1999 Compact.  *See* Proposed Tribal-State Gaming Compact (RON Tab 54).

112.    On or about January 31, 2019, the State informed Big Sandy that the State had not yet appointed a negotiator, so it could not begin negotiations.  *See* Letter from E. Kipp to Daniel H. Bromberg, Deputy Legal Affs. Sec'y, Off. of the Gov. (Feb. 4, 2019) (RON Tab 55).

113.    On February 21, 2019, having been informed that the State had appointed a negotiator, Big Sandy, by letter to the State, again requested negotiations for a Tribal-State compact, and again provided its proposed compact based on its 1999 Compact.  *See* Letter from E. Kipp to Anna Naimark, Tribal Negots. Advisor, Off. of the Governor (Feb. 21, 2019) (RON Tab 56).

114.    Amid further correspondence, the State on April 19, 2019, stated that it was amenable to a request to begin negotiations for a new Tribal-State compact, but not to extend or renew the 1999 Compact.  *See* E-mail from A. Naimark to E. Kipp (Apr. 19, 2019, 5:36 p.m.) (RON Tab 69).

115.    On April 22, 2019, by letter to the State, Big Sandy confirmed that it was ambivalent about the form of a Tribal-State compact—extension, amendment, or new compact—that would extend past the expiration of its 1999 Compact, and again provided its proposed gaming compact to the State based on the 1999 Compact.  *See* Letter from E. Kipp to A. Naimark (Apr. 22, 2019) (RON Tab 70); Proposed Tribal-State Gaming Compact (RON Tab 71).

116.    On May 2, 2019, the State provided Big Sandy a copy of its 2018 compact with the La Jolla Band of Luiseno Indians.  The State stated its preference to use the La Jolla compact, rather than Big Sandy's proposed compact, as a starting point for negotiations.  The La Jolla compact included Unlawful Compact Provisions.  *See* E-mail from A. Naimark to E. Kipp (May 2, 2019, 4:56 p.m.) (RON Tab 72); Tribal-State Compact Between the State of California and La Jolla Band of Luiseño Indians (RON Tab 73).

117.    On January 15, 2020, by letter to the State, Big Sandy requested a meeting with the State for Tribal-State compact negotiation.  *See* Letter from E. Kipp to A. Naimark (Jan. 15, 2020) (RON Tab 74).  On February 12, 2020, the State offered dates in March, and a meeting was scheduled for March 20, 2020.  *See* Letter from A. Naimark to E. Kipp (Feb. 12, 2020) (RON Tab

79); E-mail from E. Kipp to A. Naimark (Feb. 14, 2020, 10:06 a.m.) (RON Tab 80).  Because of the onset of the Covid-19 pandemic, however, that meeting was not held.  *See* E-mail from J. Peebles to A. Naimark (Mar. 17, 2020, 9:34 a.m.) (RON Tab 87).

118.    On April 30, 2020, the Secretary issued a guidance letter interpreting IGRA with respect to the Chicken Ranch Rancheria's draft Tribal-State compact, to an attorney for several CTSC Indian tribes, including Chicken Ranch Rancheria, that had sued the State for failure to negotiate in good faith under IGRA.  *See* Letter from Paula L. Hart, Dir., Off. of Indian Gaming, to Lester J. Marston, Att'y (Apr. 30, 2020) (RON Tab 285).

119.    On March 31, 2021, the United States District Court for the Eastern District of California issued an order holding that the State did not negotiate in good faith with several CTSC-member Indian tribes as required by the IGRA "by raising topics in negotiations that were beyond the scope permitted by IGRA or which required some form of meaningful concession in return." *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 530 F.Supp.3d 970, 987-88 (E.D. Cal. 2021) (RON Tab 312).

120.    On July 6, 2021, by letter to the State, Big Sandy provided a revised proposed Tribal-State gaming compact to the State.  *See* Letter from J. Peebles to A. Naimark (July 6, 2021) (RON Tab 99); Tribal-State Compact, Big Sandy draft, (July 6, 2021) (RON Tab 100).  The Tribe's proposal reflected the recent decision by the Court in *Chicken Ranch*, finding the State's attempt to impose certain provisions violated the State's obligation under IGRA to negotiate in good faith.

121.    On July 26, 2021 (via an email of that date attaching a letter dated July 21, 2021), the State expressed its preference instead to negotiate a Tribal-State compact with Big Sandy based on the State's May 1, 2018, draft, and suggested that Big Sandy provide a list of issues for discussion.  *See* E-mail from A. Naimark to J. Peebles (July 26, 2021, 7:57 p.m.) (RON Tab 101); Letter from A. Naimark to J. Peebles (July 21, 2021) (RON Tab 102).

122.    Big Sandy responded by letter to the State on July 29, 2021 and provided a revised draft Tribal-State compact to the State.  *See* Letter from J. Peebles to A. Naimark and Nathan Voegeli, Interim Tribal Negots. Advisor, Off. of the Governor (July 29, 2021) (RON Tab 103);

Tribal-State compact, Big Sandy draft (July 29, 2021) (RON Tab 104).  Big Sandy stated that the *Chicken Ranch* decision resolved issues of contention between the State and the Tribe.  Big Sandy invited the State to accept the Tribe's draft which conformed to the *Chicken Ranch* decision, or to offer the Tribe meaningful concessions for any additional provisions the State requested, or to identify specific issues to discuss in connection with the Tribe's proposal.

123.    The State provided Big Sandy with a list of issues on August 27, 2021, by email. *See* E-mail from N. Voegeli to J. Peebles (Aug. 27, 2021, 8:04 a.m.) (RON Tab 112).  On August 30, 2021, by email, the State informed Big Sandy it preferred to base negotiations on the 2018 La Jolla compact.  *See* E-mail from N. Voegeli to J. Peebles (Aug. 30, 2021, 5:34 p.m.) (RON Tab 115).

124.    Big Sandy and the State met by videoconference for a negotiation session on September 3, 2021.

125.    Rather than responding to Big Sandy's draft Tribal-State compact with concessions that would be meaningful to Big Sandy, the State urged Big Sandy to adopt provisions from recently signed compacts, such as the Tribal-State compact with Middletown Rancheria, signed by the Governor in April 2021.  The State reiterated its interest in using the Middletown Rancheria compact on September 9, 2021, and provided Big Sandy a copy of the Middletown Rancheria compact on September 28, 2021.  *See* E-mail from N. Voegeli to J. Peebles (Sept. 9, 2021, 8:05 a.m.) (RON Tab 119); E-mail from N. Voegeli to J. Peebles (Sept. 28, 2021, 4:08 p.m.) (RON Tab 127); Tribal-State Gaming Compact Between the State of California and the Middletown Rancheria of Pomo Indians of California (executed Apr. 19, 2021) (RON Tab 128).  The Middletown Rancheria compact included the Unlawful Compact Provisions.

126.    On October 1, 2021, in preparation for the next negotiation session, Big Sandy sent the State by email a list of issues the Tribe proposed to discuss.  *See* E-mail from J. Peebles to N. Voegeli (Oct. 1, 2021, 12:04 p.m.) (RON Tab 133).  The list continued to request negotiation about (1) the location(s) of the Tribe's proposed casino(s), (2) the scope of class III gaming, (3) the authorized number of gaming devices, (4) the Special Distribution Fund, (5) the Revenue Sharing

Trust Fund, and (6) the Tribe's environmental review of impacts on the off-reservation environment.

127.    On October 4, 2021, by reply email the State again proposed working from the 2018 La Jolla compact, which contained Unlawful Compact Provisions, for the subjects covered in sections 6.0 through 9.0 of that compact, including licensing, approval and testing of gaming devices, inspections, and rules and regulations for the operation and management of the gaming operation and facility.  *See* E-mail from N. Voegeli to Jason M. Andrews, Dir., Big Sandy Gaming Comm'n, and J. Peebles (Oct. 4, 2021, 4:26 p.m.) (RON Tab 136).  By email the State stated that any changes to those sections would require extensive review by State officials, and during negotiations on October 6, 2021, urged Big Sandy to accept those provisions without change to ensure that negotiations could conclude before the expiration of the 1999 Compact.  *See* E-mail from N. Voegeli to J. Peebles (Oct. 4, 2021, 10:36 a.m.) (RON Tab 134).

128.    Big Sandy and the State held a negotiation session by videoconference on October 6, 2021.  During that session, the State again redirected the Tribe to use one of the Tribal-State compacts recently negotiated by the Governor as a template for future negotiations.  The State suggested three Tribal-State compacts as potential templates: (1) the Picayune Rancheria of Chukchansi Indians, (2) the Santa Rosa Indian Community, or (3) the Table Mountain Rancheria. *See* Tribal-State Compact Between the State of California and Picayune Rancheria of Chukchansi Indians of California (executed Aug. 10, 2021) (RON Tab 281); Tribal-State Compact Between the State of California and Santa Rosa Indian Community of the Santa Rosa Rancheria (executed Apr. 19, 2021) (RON Tab 282); Tribal-State Compact Between the State of California and Table Mountain Rancheria (executed Aug. 10, 2021) (RON Tab 335).  The Table Mountain Rancheria compact was signed by the Governor and presented to the Legislature for ratification.  It had not yet been ratified, but it was substantially the same as the Picayune Rancheria and Santa Rosa compacts, which had been ratified.  All three compacts included the Unlawful Compact Provisions.

129.    On October 7, 2021, the Secretary sent a letter to Governor Newsom regarding the Picayune Rancheria compact that had been submitted for the Secretary's review.  *See* Letter from

P. Hart to G. Newsom (Oct. 7, 2021) (RON Tab 283).  The Secretary requested that the State explain how several provisions in the Picayune Rancheria compact were permissible subjects of negotiation under IGRA, including how those provisions were directly related to the operation of gaming activities.  The provisions of concern included terms relating to tobacco sales, tort claims, environmental regulation, and labor relations.  The Secretary also requested justifications regarding several aspects of the Picayune Rancheria gaming compact's revenue sharing provisions, including the Special Distribution Fund, the Revenue Sharing Trust Fund, the Tribal Nation Grant Fund, and an explanation of how obligations and incentives to make payments to local governments comply with IGRA.  The Secretary sent similar letters to the Governor on October 27, 2021, expressing concerns about the Middletown Rancheria and Santa Rosa Indian Community gaming compacts.

130.    On October 19, 2021, by email to Big Sandy, the State advised that Big Sandy should model its forthcoming revised Tribal-State compact on the Picayune Rancheria compact.  *See* E-mail from N. Voegeli to J. Peebles (Oct. 19, 2021, 6:42 p.m.) (RON Tab 143).  The State also re-emphasized the "limited time to finalize a compact in order to submit it to the Legislature in January 2022 to allow timely ratification and U.S. Department of the Interior review," and again urged Big Sandy not to propose material variations to the Picayune Rancheria compact, particularly in sections 6.0 through 9.0.

131.    On October 20, 2021, as requested by the State, Big Sandy provided the State a draft Tribal-State compact using the Picayune Rancheria compact as a template.  *See* Letter from J. Peebles to N. Voegeli (Oct. 20, 2021) (RON Tab 146); Tribal-State Compact, Big Sandy draft (Oct. 20, 2021) (RON Tabs 147 (redline) and 151 (clean)).  Big Sandy expressed that its revisions to the Picayune Rancheria compact were needed to ensure that the compact would contain only subjects of negotiation that are permitted under IGRA.  Big Sandy's proposed revisions directly addressed issues raised in bad faith litigation by other Indian tribes, the Court's decision in *Chicken Ranch*, and the direction provided by the Secretary on April 30, 2020.  Big Sandy was not yet

aware of the Secretary's October 7, 2021 letter to the Governor expressing numerous concerns about the Picayune Rancheria compact.

132.    On October 29, 2021, the State responded to Secretary's October 7, 2021, request for additional justification regarding the Picayune Rancheria compact.  *See* Letter from N. Voegeli to P. Hart (Oct. 29, 2021) (RON Tab 284).  The State's response included, essentially, the same rationale it has given to Big Sandy in the course of compact negotiations.

133.    On November 5, 2021, having considered the State's October 29, 2021, justifications, the Secretary formally disapproved the Picayune Rancheria compact.  *See* Letter from B. Newland to C. Gonzales, *supra* (RON Tab 257).  Similar disapprovals of the Middletown Rancheria and Santa Rosa Indian Community compacts followed on November 23, 2021.  *See* Letters from B. Newland to J. Simon III and L. Sisco, *supra* (RON Tabs 259, 258, respectively). In each Disapproval Letter, the Secretary set forth an interpretation of IGRA consistent with previous Secretarial decisions, explaining how and why IGRA limits the subjects over which states and tribes may negotiate a Tribal-State compact, and provided specific objections to provisions of the Tribal-State compacts that violate IGRA.   In each Disapproval Letter, the Secretary disapproved the compact "as a violation of IGRA because it contains terms that are outside of the narrow scope of IGRA approved topics and are not 'directly related to the operation of Class III gaming activities.'"

134.    The Disapproval Letters, *inter alia*, set forth the Secretary's interpretation of IGRA's "catch-all" category of Section 2710(d)(3)(C)(vii), "subjects that are directly related to the operation of gaming activities."  The Disapproval Letters disapproved the "but for" test for the relationship between the subject of a compact provision and the operation of class III gaming activities and the equivalent "principal purpose" test imposed by the State in the disapproved Tribal-State compacts.

135.    On November 29, 2021, the State returned a copy of its draft based on the Picayune Rancheria compact to Big Sandy, incorporating only insubstantial revisions that Big Sandy had proposed.  *See* E-mail from N. Voegeli to J. Peebles (Nov. 29, 2021, 5:35 p.m.) (RON Tab 158);

Tribal-State Compact, State's draft (Nov. 29, 2021) (RON Tab 159).   The State refused to incorporate any of Big Sandy's substantive proposed revisions that were included in Big Sandy's October 20 draft.

136.    On November 30, 2021, by email to Big Sandy, the State acknowledged that the Secretary had disapproved the Picayune Rancheria compact on which the State based the compact it proposed to Big Sandy on November 29.  *See* E-mail from N. Voegeli to J. Peebles (Nov. 30, 2021, 10:35 a.m.) (RON Tab 163).  The State suggested that it "may be helpful" for the parties to discuss "the implications of the compact disapprovals relative to the State and Tribe's negotiations."  Although the State's November 29 draft post-dated the Secretary's Disapproval Letters, the State neither accepted any of Big Sandy's revisions, nor proposed any revisions of its own, to address the issues raised in the Disapproval Letters.

137.    The State and Tribe held a negotiation session by video conference on December 2, 2021.

138.    On December 6, 2021, the State, by letter to Assistant Secretary – Indian Affairs Brian Newland, requested that the Secretary reconsider the decision to disapprove the Picayune Rancheria Tribal-State compact on the grounds that (1) the disapproval was "contrary to the Secretary's approach in numerous prior and currently operative compacts," (2) "disrupts years of complex and carefully considered negotiations," and (3) the State and the Tribe should be entitled to "determine their own best interests in negotiating a compact."  *See* Letter from N. Voegeli to Assistant Secretary – Indian Affairs Brian Newland (Dec. 6, 2021) (RON Tab 336).

139.    On December 22, 2021, Big Sandy provided the State a draft Tribal-State compact containing substantial revisions.  *See* E-mail from J. Peebles to N. Voegeli (Dec. 22, 2021, 9:45 a.m.) (RON Tab 172); Tribal-State Compact, Big Sandy draft (Dec. 22, 2021) (RON Tab 173). Big Sandy sent the State a draft Tribal-State compact with further revisions on January 4, 2022. *See* E-mail from Patrick R. Bergin, Att'y, Big Sandy, to N. Voegeli (Jan. 4, 2022, 4:07 p.m.) (RON Tab 174); Tribal-State Compact, Big Sandy draft (Jan. 4, 2022) (RON Tabs 175 (clean) and 176 (redline)).   The December and January revisions addressed the issues raised by the Secretary's

November 5, 2021 disapproval of the Picayune Rancheria compact and the other Disapproval Letters.

140.    By reply email, the State reiterated on January 5, 2022, that it "fundamentally disagrees" with the Secretary's Disapproval Letters and stated that the issues implicated in the Disapproval Letters "can be addressed by narrowly tailored revisions" and that they do not "indicate any concerns with broader topics."  The State declared that the Secretary's disapprovals only relate to "two issues: the scope of activities that would trigger environmental review and regulation of tobacco product sales."  *See* E-mail from N. Voegeli to P. Bergin (Jan. 5, 2022, 4:59 p.m.) (RON Tab 177).

141.    Big Sandy and the State held a video conference negotiation session on January 6, 2022.

142.    During the December and January negotiation sessions, Big Sandy discussed the Tribe's concerns about the compact negotiation process because the State was insisting on including provisions in the compact that the Secretary had expressly disapproved.  Big Sandy advised the State that even if it agreed to such provisions with the State, its Tribal-State compact would be disapproved by the Secretary and could not go into effect.  Big Sandy requested that the State provide revisions to the proposed gaming compact that address the Secretary's disapprovals.  The State did not offer any revisions that would enable Big Sandy to conclude a Tribal-State compact that could be approved by the Secretary.  Rather, the State declared that it was waiting until (1) the Secretary reconsidered the Disapproval Letters, or (2) the Ninth Circuit Court of Appeals issued a decision in the *Chicken Ranch* appeal.

143.    On January 19, 2022, by letter to the State, Big Sandy expressed that the State's insistence on provisions disapproved by the Secretary in her Disapproval Letters, or inconsistent with the Secretary's reasoning, based on the State's reliance on some anticipated but unknown future event that would change the law in its favor, creates a negotiating impasse and violates the State's duty to negotiate in good faith.  *See* Letter from P. Bergin to N. Voegeli (Jan. 19, 2022) (RON Tab 182).

144.    On January 27, 2022, the State provided a revised draft of its compact based on the Picayune Rancheria compact to Big Sandy, which still failed to address any of the issues identified by the Secretary's April 30, 2020 guidance letter, the district court's *Chicken Ranch* decision, and the Disapproval Letters, regarding Unlawful Compact Provisions.  *See* E-mail from N. Voegeli to J. Peebles (Jan. 27, 2022, 4:27 p.m.) (RON Tab 188); Tribal-State Compact, State's draft (Jan. 27, 2022) (RON Tab 189).  Although the State's January 27 proposal accepted several of Big Sandy's revisions, the State rejected all the revisions that addressed the substantive issues raised the Disapproval Letters, the *Chicken Ranch* decision, and the Secretary's prior Deemed Approval decision letters to the State.  Nor did it seek to address them with its own proposed revisions.  Rather, the State's January 27 proposal provided Big Sandy with an "either/or" alternative for the Tribal-State compact's Section 11 environmental regulations:  Big Sandy could either accept the Section 11 provisions the State negotiated with Picayune Rancheria, or alternatively accept the substantially similar environmental regulations the State negotiated with Shingle Springs Band of Miwok Indians in 2008.  Both of the State's alternative demands attempted to impose Unlawful Compact Provisions on Big Sandy.  The State did not negotiate either set of environmental provisions with Big Sandy, but demanded that Big Sandy adopt Unlawful Compact Provisions the State had previously negotiated with other Indian tribes.

145.    To encourage Big Sandy's acceptance of the 2008 Shingle Springs environmental regulations, the State incorrectly represented that the Secretary had affirmatively approved the Shingle Springs compact.  *See* Tribal-State Compact, State's draft (Jan. 27, 2022), cmts. on pp. 8, 75 (RON Tab 189).  In fact, the Shingle Springs compact was not affirmatively approved by the Secretary; it was "Deemed Approved" by operation of law to the extent it is consistent with IGRA. *See* Indian Gaming, 73 Fed. Reg. 75764 (Dec. 12, 2008).  Subsequently, the Secretary issued a Deemed Approved decision letter in 2013 expressing "significant concerns" that the Section 11 environmental provisions in the Shingle Springs compact were not consistent with IGRA.  *See* Letter from K. Washburn to N. Fonesca (July 15, 2013) (RON Tab 230).

146.    Furthermore, the State proposed to penalize Big Sandy for not accepting the Picayune Rancheria compact Section 11 environmental regulations, by also stating that it would eliminate Big Sandy's ability to use categorical exclusions, negative declarations, and mitigated negative declarations if Big Sandy were to choose the 2008 Shingle Springs regulations.

147.    On February 7, 2022, the State responded by letter to Big Sandy's January 19 letter. *See* Letter from N. Voegeli to P. Bergin (Feb. 7, 2022) (RON Tab 190).  The State stated that the Disapproval Letters make up "one more consideration" in the landscape of IGRA interpretations, and that the Disapproval Letters "do[] not preclude meaningful negotiations to reach a final compact," despite having stated on January 26, 2022, that because of the "uncertainty created by the [Disapproval Letters], the State and the Tribe are unlikely to be able to negotiate a new compact with sufficient confidence that the compact would be approved by the Secretary and take effect under IGRA prior to the expiration of the 1999 Compact."  *See* Letter from N. Voegeli to E. Kipp (Jan. 26, 2022) (RON Tab 186).

148.    The State's February 7, 2022, letter declared that "the State disagrees with Interior's reasoning and conclusion that the disapproved compacts fail to comply with IGRA."  The State went on to declare that the Disapproval Letters, Ninth Circuit Court of Appeals case law, prior Secretarial procedures, and prior Deemed Approval decision letters from the Secretary "inform the State's interpretation and understanding of what is or is not appropriate under IGRA."  Further, the State did not acknowledge that it is bound by judicial decisions, such as the *Chicken Ranch* decision holding that the State's negotiation of similar Tribal-State compact provisions was not in good faith, or by the Secretary's recent Disapproval Letters, or even that the State's "interpretation" should at least be guided by, let alone bound by and required to defer to the Secretary's longstanding interpretation of IGRA in nearly twenty Secretarial Deemed Approval decision letters describing Unlawful Compact Provisions in California Tribal-State compacts.

149.    On February 9, 2022, by letter responding to the State's February 7 letter, Big Sandy reminded the State that the Secretary has final authority to approve or disapprove a Tribal-State compact, and that the Secretary's reasoned interpretation of IGRA is entitled to deference.

*See* Letter from P. Bergin to N. Voegeli (Feb. 9, 2022) (RON Tab 191). Big Sandy requested that the State identify, for each provision of its proposed Tribal-State compact, the provision of IGRA that authorizes the State's proposed regulation. Big Sandy further suggested that the State identify meaningful concessions it is prepared to offer the Tribe.

150. In the same letter, Big Sandy requested that the State and the Tribe accept the Secretary's offer to provide technical assistance regarding the Secretary's interpretation of IGRA. Big Sandy stated: "Resolving the State's understanding of the [Secretary]'s requirements for an approvable compact is necessary to ensure that the Tribe and the State can reach an agreement that the [Secretary] will approve before the 1999 compact expires."

151. On February 10, 2022, Big Sandy and the State conducted negotiations by video conference. In that conference, the Tribe reiterated its request that the Tribe and the State accept the Secretary's offer to provide technical assistance to ensure that a Tribal-State compact agreement could be approved by the Secretary. The State declared that it was improper for the Secretary to provide technical assistance in a Tribal-State compact negotiation session. The State declared that the Tribe and the State were the only two decision-makers for concluding a Tribal-State compact and that the Secretary did not have a role in the negotiations.

152. During the February 10, 2022, video conference, the State informed the Tribe that the Tribe could independently seek technical assistance from the Secretary, but that the State would not abide by any written direction the Secretary provided. The State declared that it would continue to follow its own interpretation of IGRA. In response, Big Sandy stated that negotiations were at an impasse, because the State's interpretation of IGRA does not comply with the Secretary's decisions, and any agreement the Tribe reached with the State would not be approved by the Secretary. The State disagreed, stating that negotiations could continue under the State's interpretation of IGRA that was contrary to that of the Secretary.

153. Further, during the February 10, 2022, video conference, Big Sandy urged the State to respond in a timelier manner, so that negotiations could conclude before its 1999 Compact expired. The State refused Big Sandy's request, committing only to reviewing the Tribe's one-

sentence revision that would allow class III gaming on the McCabe Allotment within the following 23 days, by March 4, 2022.

154.    On March 4, 2022, by reply letter the State refused the Tribe's request for the Secretary to provide technical assistance to the State and the Tribe in a future negotiation session. *See* Letter from N. Voegeli to J. Peebles and P. Bergin (Mar. 4, 2022) (RON Tab 198). The State accused the Tribe of trying to "add a third party" to the compact negotiations between the Tribe and the State. The State further disagreed with the Tribe "that [the Secretary]'s interpretation of IGRA, particularly related to the scope of compact negotiations, is entitled to deference."

155.    On March 14, 2022, Big Sandy sent the State a draft Tribal-State compact that addressed the reasons the Secretary disapproved the Picayune Rancheria compact, and additional authority regarding the Unlawful Compact Provisions. *See* Tribal-State Compact, Big Sandy draft (Mar. 14, 2022) (RON Tabs 207 (clean) and 217 (redline)). The Tribe referred to this draft as its "Final Offer." Accompanying the Tribe's Final Offer was a detailed analysis of the federal authorities regarding the subjects of negotiation permitted under IGRA, and providing legal authority for the Tribe's revisions to the State's draft. *See* Letter from J. Peebles to N. Voegeli (Mar. 14, 2022) (RON Tab 206). The Tribe requested that the State accelerate the pace of negotiations, and to respond with its acceptance of the Tribe's Final Offer before March 31, 2022.

156.    On March 16, 2022, by email to the State, Big Sandy advised that it remained willing to engage in further Tribal-State compact negotiations regarding terms permitted by IGRA and the Secretary's interpretation of IGRA. However, the Tribe was not willing to negotiate for subjects that are not permitted under IGRA or exceed the scope of permissible Tribal-State compact provisions as expressed by the Secretary. *See* E-mail from J. Peebles to N. Voegeli (Mar. 16, 2022, 4:30 p.m.) (RON Tab 214).

157.    The State's email to Big Sandy in response, on March 17, 2022, requested a discussion of which subjects the Tribe considered to be impermissible under IGRA. *See* E-mail from N. Voegeli to J. Peebles (Mar. 17, 2022, 3:20 p.m.) (RON Tab 218).

158.     Big Sandy responded by letter to the State on March 21, 2022.  *See* Letter from P. Bergin to N. Voegeli (Mar. 21, 2022) (RON Tab 219).  Big Sandy explained that it had accepted nearly all of the State's compact provisions that comply with IGRA, and that the discussion requested by the State could be found in the detailed analysis contained in the Tribe's March 14, 2022, letter, and in the Secretary's November 2021 Disapproval Letters, as well as numerous Deemed Approved Letters and Disapproval Letters issued by the Secretary since 2011.  Big Sandy urged the State to address the core compact issues highlighted by the Secretary rather than tinkering with peripheral provisions.  With the letter, Big Sandy supplied the State a table cataloguing the State's refusals to engage in productive negotiations to date.

159.     On March 23, 2022, the Tribe and the State engaged in negotiations by video conference.  During that video conference, the State declared, *inter alia*, that:

A.     The State will not negotiate a Tribal-State compact with Big Sandy that is likely to be approved by the Secretary.

B.     The State's only goal is to negotiate a Tribal-State compact that the Secretary could not approve, but could allow to become effective by operation of law (Deemed Approved).

C.     The State will not negotiate language that alters its demand in Section 11 of the draft Tribal-State compact which would require Big Sandy to negotiate future agreements with local governments.

D.     The State demanded provisions regarding the issue of a minimum wage for Big Sandy's employees that are not directly related to the operation of class III gaming activities, such as Big Sandy's janitors and parking lot attendants.

160.     On April 13, 2022, by letter to the State, Big Sandy described in detail the pattern of rejection by the Secretary of the State's Tribal-State compact provisions, highlighted the Department's Consultation Draft of regulatory changes to Secretarial review of Tribal-State compacts, and analyzed the illegality of the State's imposed revenue sharing provisions.  *See* Letter from J. Peebles to N. Voegeli (Apr. 13, 2022) (RON Tab 229); Consultation Draft, *supra* (RON Tab 260).

161.    On April 22, 2022, the State provided Big Sandy with a revised Tribal-State compact draft.  *See* E-mail from N. Voegeli to J. Peebles (Apr. 22, 2022, 1:29 p.m.) (RON Tab 276); Tribal-State Compact, State's draft (Apr. 22, 2022) (RON Tabs 277, 278).  The State continued to attempt to impose the Unlawful Compact Provisions.

162.    The State's April 22, 2022, Tribal-State compact draft added at least seven provisions establishing an impermissible test for the relationship between State regulation and class III gaming.  Rather than applying the "directly related to" test found in IGRA and as directed by the Secretary, the State instead demanded that Big Sandy accept broader "principal purpose," "not unrelated," "in connection with," "indirect or deemed likely to," and "arising out of, connected with, or relating to" tests, which would impermissibly broaden the scope of the State's proposed Tribal-State compact provisions such that they would violate IGRA.

163.    The State also added provisions for State regulation of food and beverage services and water quality that the Secretary had previously disapproved.

164.    The State's April 22, 2022, Tribal-State compact draft further inserted demands for State regulation of environmental impacts that the Secretary had disapproved.  The State demanded that Big Sandy enable non-State and local government actors to interfere in the Tribe's economic development projects through the attempted imposition of subsequent intergovernmental agreements and binding arbitration that modify the terms of the Tribal-State compact before the Tribe would be allowed to begin a Project.  Conditioning an Indian tribe's gaming activities on unspecified provisions in a subsequent intergovernmental agreement was expressly disapproved by the Secretary because it is inconsistent with IGRA's requirement that all compact amendments be reviewed by the Secretary.

165.    The State further demanded that Big Sandy submit to binding arbitration where it could be required to comply with State law—a provision expressly disapproved by the Secretary.

166.    The State's April 22, 2022, Tribal-State compact draft also continued to seek to impose new revenue sharing provisions on Big Sandy, without proposing meaningful concessions to Big Sandy in exchange.  The State refused to negotiate whether it may expand the uses of the

SDF and RSTF beyond the limits set in the 1999 Compact.  The State also refused to negotiate Big Sandy's obligations to pay into the new TNGF, and refused to negotiate for provisions that ensure Big Sandy's payments are not used for improper purposes.

167.    On May 18, 2022, Big Sandy responded to the State that its continued imposition of Unlawful Compact Provisions is clear evidence that the State has no intent to negotiate with the Tribe in good faith.  *See* Letter from J. Peebles to N. Voegeli (May 18, 2022) (RON Tab 279).  Big Sandy invited the State to take corrective action and replace its April 22, 2022, Tribal-State compact draft with a proposal that complies with IGRA.

168.    On June 27, 2022, the State forwarded letters to Big Sandy dated May 17, 2022, and May 23, 2022, which Big Sandy had not previously received.  *See* Letter from N. Voegeli to J. Peebles (June 27, 2022) (RON Tab 323.)

169.    In its May 17, 2022 letter to Big Sandy, the State emphasized again that it "disagrees with DOI's interpretation that certain compact provisions exceed the allowable scope of negotiations under [IGRA]."  *See* Letter from N. Voegeli to J. Peebles (May 17, 2022) (RON Tab 324.)  The State also conceded that the exclusive right of Indian tribes to operate slot machines in California "cannot be new consideration for new types of revenue sharing," but insisted that exclusivity's "ongoing value" to Big Sandy is valid consideration in exchange for the State's current demands for SDF, RSTF, and TNGF payments.

170.    The State's letter of May 17, 2022, also proposed specific terms for Big Sandy's payment of money as a condition for its ability to engage in gaming activity.  The State asked Big Sandy to pay the State a "pro rata share" of the State's total appropriations for a virtually unlimited array of purposes it deems "consistent with IGRA," and pay 6% to 7% of its net win to the RSTF and TNGF, with partial credits available if Big Sandy were to make "payments to local governments for public safety services, investments in renewable energy or conservation projects, and costs to support cultural awareness and the preservation of cultural resources."

171.    The State's May 23, 2022 letter to Big Sandy argued that many of the Unlawful Compact Provisions to which Big Sandy objects have been included in Secretarial Procedures.  *See* Letter from N. Voegeli to J. Peebles (May 23, 2022) (RON Tab 325).

172.    Big Sandy and the State held their final compact negotiation session on June 28, 2022, by videoconference.

173.    On July 6, 2022, in a letter to the State, Big Sandy advised the State that the inclusion of certain provisions in Secretarial procedures does not suggest that IGRA allows the State to demand similar provisions in compact negotiations.  *See* Letter from J. Peebles to N. Voegeli (July 6, 2022) (RON Tab 329).

### D.    Unlawful Compact Provisions the State Seeks to Impose on Big Sandy – Regulatory Provisions.

174.    For more than twenty years, Big Sandy has successfully operated class III gaming activities pursuant to its 1999 Compact, which includes 35 pages of negotiated regulations.  Now, without any reasoned explanation or evidence that changes in those regulations are necessary, the State seeks to impose on Big Sandy a compact that spans 120 pages and includes numerous provisions that exceed the subjects and scope of negotiations permitted by IGRA.

175.    The State ignored the Secretary's consistent direction and warnings that its Tribal-State compacts included subjects of negotiation that are not permitted under IGRA.  The State imposed the same impermissible subjects of negotiation on Big Sandy in each of its Tribal-State compact drafts.

176.    On October 20, 2021, as requested by the State, Big Sandy provided to the State a draft Tribal-State compact based on the Picayune Rancheria compact with substantial revisions that Big Sandy expressed were needed to ensure that the compact complies with IGRA.  Big Sandy's proposed revisions directly addressed issues raised in ongoing bad faith litigation by other Indian tribes, the Court's decision in *Chicken Ranch*, Congress's intent in enacting IGRA, and the direction provided by the Secretary in Disapproval Letters and Deemed Approved Letters.

177.    Following the Secretary's disapproval of the Picayune Rancheria Tribal-State compact on November 5, 2021, and disapproval of the Middletown and Santa Rosa Tribal-State

compacts on November 23, 2021, Big Sandy provided the State further revisions to its draft Tribal-State compact on December 22, 2021, January 5, 2022, and March 14, 2022, which addressed the IGRA violations the Secretary identified in her disapprovals, and which were informed by technical consultation between Big Sandy and the Secretary to ensure Big Sandy's revisions comply with IGRA.

178.    The State sent draft Tribal-State compacts to Big Sandy on November 29, 2021, January 27, 2022, and April 22, 2022.  In each draft and throughout the compact negotiations, the State has ignored the decisions of the Secretary and rejected most of Big Sandy's substantive revisions.  By demanding compact provisions the Secretary had previously disapproved, either expressly or by logical extension of the Secretary's express analysis upon which those rejections were based, the State attempted to impose Unlawful Compact Provisions on Big Sandy.

179.    Consistent with the State's pattern and practice of imposing non-negotiable compact provisions on Indian tribes, the State has refused to negotiate core provisions of the Tribal-State compact with Big Sandy.  The State has refused at all times to accept Big Sandy's revisions to remove Unlawful Compact Provisions that would bring the Tribal-State compact into compliance with IGRA, federal court decisions, and the Secretary's reasoned interpretation of IGRA.

180.    The State demanded the following Unlawful Compact Provisions:

A.    The State demanded compact provisions containing and relying on overbroad definitions of the terms Gaming Employees, Gaming Facility, Gaming Operation and Project.  These definitions and other provisions use the "but for," "principal purpose," and other similar tests.  The State's definition of "Gaming Employee" includes "any natural person who is an employee of the Gaming Operation and who … is in any way responsible for supervising Gaming Activities or persons who conduct, operate, account for, assist, or supervise any such Gaming Activities … or … whose employment duties require or authorize access to areas of the Gaming Facility in which any activities related to Gaming Activities are conducted but are not open to the public."  The State's definition of "Gaming Operation" includes the

entire "business enterprise that offers and operates Gaming Activities" that are not "unrelated to the operation of the Gaming Facility." The State's definition of "Gaming Facility" includes "any building in which Gaming Activities or gaming operations occur, or in which business records, receipts, or funds of the Gaming Operation are maintained … and all rooms, buildings and areas including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation…." The State's definition of "Project" includes "(i) the construction of a new Gaming Facility after the effective date of this Compact, (ii) a renovation, expansion or modification of an existing Gaming Facility, or (iii) other activity involving a physical change to the Tribe's Indian lands environment, provided the principal purpose of which is directly related to the activities of the Gaming Operation, and any of which may cause a Significant Effect on the Off-Reservation Environment." Compact provisions which incorporate the defined terms regulate subjects that are not directly related to the operation of class III gaming activities. Such provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

B. The State demanded environmental provisions that exceed the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C). These provisions apply the State's impermissibly overbroad definitions. They require Big Sandy to conduct extensive environmental review for the construction or modification of facilities where no class III gaming occurs, as a mandatory condition for Big Sandy to conduct class III gaming operations. IGRA does not authorize State regulation of the environmental impacts of an Indian tribe's projects on its Indian lands that are not directly related to the tribe's operation of class III gaming activities.

C. The State demanded compact provisions that would prohibit Big Sandy's commencement of a Project until it executes intergovernmental agreements with the County of Fresno, a political subdivision of the State, and the California Department of Transportation (Caltrans), an administrative agency of the State

government, to address matters such as energy consumption, traffic, public safety, and aesthetic impacts to the community character. These provisions also permit the County of Fresno and Caltrans to use binding arbitration to compel Big Sandy to enter into such agreements and to enforce Big Sandy's compliance with them, and the compact provisions prohibit Big Sandy's commencement of a Project until any such dispute is resolved. These provisions incorporate the State's overbroad definition of Project. They also incorporate mandatory conditions to be imposed upon Big Sandy's ability to conduct class III gaming which are not defined in the Tribal-State compact, will not be the product of negotiations between Big Sandy and the State, and will evade the Secretary's review.

D.    The State demanded compact provisions regarding the licensing of Big Sandy employees in excess of the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C). These provisions incorporate the State's overbroad definition of Gaming Employee. Under IGRA, Big Sandy's gaming ordinance is required to provide an adequate system for issuing licenses for "primary management officials and key employees of the gaming enterprise" in compliance with federal regulations. 25 U.S.C. § 2710(b)(2)(F); 25 C.F.R. Part 558. Under Section 2710(d)(3)(C)(vi), Big Sandy and the State may negotiate "standards for the operation of [class III gaming] activity … including licensing." IGRA does not authorize Tribal-State compacts to include provisions that enlarge the scope of employees subject to licensing under IGRA beyond those who engage in the operation of class III gaming activity.

E.    The State demanded compact provisions that require Big Sandy, with respect to all Gaming Operation and Gaming Facility employees, to adopt State anti-discrimination, anti-harassment, and anti-retaliation employment laws, and waive its sovereign immunity in connection therewith; adopt minimum wage, hour, and overtime laws specified by the State; adhere to the State's workers compensation standards; comply with the State's unemployment and disability insurance laws and

waive its sovereign immunity in connection therewith; and adopt a labor relations ordinance for employee organization and representation. Federal laws other than IGRA govern Big Sandy in some or all of these areas. These compact provisions incorporate the State's impermissibly overbroad definitions. Under Section 2710(d)(3)(C)(i), Big Sandy and the State may negotiate provisions relating to the application of the civil laws and regulations of the State that are "directly related to, and necessary for, the licensing and regulation of [class III gaming] activity." These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

F.  The State demanded compact provisions that require Big Sandy to "adopt and comply with standards no less stringent than California public health standards for food and beverage handling" and "allow inspection of food and beverage services by state or county health inspectors." The handling of food and beverages is not a subject that is directly related to the operation of gaming activities, and the regulation thereof is not a standard for the operation of gaming activity. These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

G.  The State demanded compact provisions that require Big Sandy to "adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California," and "allow for inspection and testing of water quality by state or county health inspectors." The quality of drinking water is not a subject that is directly related to the operation of gaming activities, and the regulation thereof is not a standard for the operation of gaming activity. These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

H.  The State demanded compact provisions that require Big Sandy to adopt standards set by the State governing Big Sandy's tort liability for personal injuries and property damage "directly arising out of, connected with, or relating to the

operation of the Gaming Operation, Gaming Facility, or Gaming Activities." These provisions incorporate the State's impermissibly overbroad definitions. These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

**E.     Unlawful Compact Provisions the State Seeks to Impose on Big Sandy – Taxes, Fees, Charges or Other Assessments.**

181.    The State has attempted to impose the following taxes, fees, charges, or other assessments upon Big Sandy:

A.    Payments into the SDF in excess of the amounts necessary to defray the State's costs of regulating Big Sandy's class III gaming activity.

B.    Payments into the RSTF in excess of the amount necessary to allow the distribution of $1.1 million per year to "Non-Compact Tribes" as provided in the 1999 Compact.

C.    Payments into the TNGF.

D.    Payments to local governments in unspecified amounts pursuant to subsequent intergovernmental agreements.

E.    A penalty charge on any late payments into the SDF.

F.    A penalty charge on any late payments into the RSTF and TNGF.

182.    The State has sought to impose these taxes, fees, charges, or other assessments on Big Sandy, and has never wavered from its demands for such Unlawful Compact Provisions that are not permitted by IGRA. Big Sandy has proposed revisions to the Tribal-State compact draft to remove these unlawful taxes, fees, charges, or other assessments. The State has refused to accept Big Sandy's proposed revisions. The State has sought to impose these taxes, fees, charges, or other assessments as a condition of entering into a Tribal-State compact with Big Sandy.

183.    The RSTF compact provisions currently demanded by the State are significantly more expansive than the RSTF provisions of the 1999 Compacts. Under the State's current RSTF demands, the amount of the Tribe's payment would be a percentage of its gaming revenue, rather than a fee per gaming device as provided under the 1999 Compacts. The State's draft Tribal-State compact provisions would authorize the State to deposit some or all of the Tribe's payments into

the RSTF or the TNGF.  The State's Tribal-State compact provisions also would encourage the Tribe to spend gaming revenues in ways not authorized by IGRA, such as obligatory payments to local governments, as a substitute for paying into the RSTF.  The State also proposed Tribal-State compact provisions for, and other Tribal-State compacts provide for, numerous "credits," under which the Tribe may reduce RSTF payments by contributing money to other programs that are not directly related to the operation of class III gaming activities, such as paying the cost of providing cultural, educational, and recreational programs and services, payment of sales taxes at a Gaming Facility and the transient occupancy tax at a hotel, investments in renewable energy or conservation projects, costs for a museum or investments in cultural preservation, and expenses for wildlife protection and community beautification.

184.    The compact provisions concerning the SDF currently demanded by the State are significantly different from the SDF provisions in the 1999 Compacts.  Under the current SDF provisions, the amount of each Tribe's payment is based on that Tribe's share of the total number of gaming devices operated by Indian tribes in California, multiplied by the State's annual budget appropriation to fund the State's administration of all Tribal-State compacts and Secretarial Procedures in California, and its Office of Problem Gambling.  The list of State agencies that may be funded with tribal gaming revenues has grown from two agencies to nine.

185.    Under the Tribal-State compact the State has attempted to impose on Big Sandy, which includes provisions that are similar to other Tribal-State compacts, the State would have discretion to deposit Big Sandy's revenue sharing payments into the RSTF or TNGF.  Provided the RSTF were fully funded, the State could deposit all of the Tribe's revenue sharing payments into the State's discretionary TNGF fund.  The State could also transfer money from the RSTF into the TNGF.  And the State could transfer money from the SDF to the RSTF if the account has insufficient funds.

186.    The State's demands for SDF, RSTF, and TNGF revenue sharing are completely unrelated to assessments necessary to defray the costs of regulating Big Sandy's class III gaming activity.  The State's authority to transfer some or all of the funds between the SDF, RSTF, and TNGF would establish fully-fungible accounts that functionally would operate as a single general

fund for the State to allocate tribal gaming revenues to State and tribal governments with substantial discretion—limited primarily by the requirement that it pay $1.1 million to each limited-gaming and non-gaming Indian tribe each year.

187.    The Secretary has repeatedly explained to the State that its method of calculating an Indian tribe's SDF contributions "by appropriation rather than by reference to actual costs" includes State expenditures that are not directly related to the Indian tribe's class III gaming.  Letter from L. Roberts to R. Welch, Jr., *supra*, at n. 20 (RON Tab 243).  *See also* Letter from K. Washburn to B. Mazzetti (Feb. 4, 2015) (RON Tab 334); Letter from K. Washburn to V. Armenta, *supra*, at n. 18 (RON Tab 239).

188.    The total annual distribution of $1.1 million each to Non-Compact Indian tribe, now called "non-gaming" and "limited-gaming" Indian tribes, amounts to approximately $96.5 million.

189.    In 2007, the California State Auditor published a report (No. 2006-036) addressing the State's uses of SDF funds arising from Tribal-State compacts which concluded that "not every project funded under one of [the statutorily mandated] purposes was linked to an impact from a casino."  (RON Tab 313).  The State Auditor further found that, out of thirty grants made with SDF Funds, at least five expended money for purposes that did not offset the adverse effects of Indian casinos, and an additional ten primarily addressed needs that were unrelated to Indian gaming.  The State Auditor also found that local governments were maintaining large accounts with payments from Indian gaming, and reallocating the interest on those accounts for general fund purposes in violation of IGRA.  The State's misuse of funds from Indian gaming affected one-half of the discretionary grants of SDF funds that were reviewed by the State Auditor.

190.    In 2011, the California State Auditor published another report (No. 2010-036) regarding the State's use of SDF funds.  (RON Tab 314).  The State Auditor again found that for one-half of the of the grants reviewed, "the grant recipient either could not provide evidence of, or could not quantify, the impact of the casino."  The State Auditor therefore found that the grantee could not prove that Indian gaming funds were used "in proportion to the impact of the casino, as

required by law." In at least one case, a grant of funds from the SDF was awarded to an ineligible entity.

191.    In 2015, the California Gambling Control Commission ("CGCC") reported to the California Joint Legislative Budget Committee that it was continuing to use SDF funds for purposes not directly related to an Indian tribe's class III gaming activities. "Report on the Use of Funds from the Indian Gaming Special Distribution Fund," Cal. Gambling Control Comm., Item 0855-111-0367 (Apr. 1, 2015) (RON Tab 311). For example, the CGCC used SDF funds to pay for the State's lawsuits brought by Indian tribes to enforce IGRA, its costs for negotiating new Tribal-State compacts, its costs for releasing public records under State law, and its advice to state and local agencies. *Id*. at pp. 14-15. Further, the CGCC's report stated that the California Department of Justice does not record how SDF funds were spent on programs it administers. *Id*. at pp. 15, 18.

192.    Since the release of the State Auditor's report in 2011, the State's annual transfer from the SDF to the California Gambling Control Commission for such grants has decreased from approximately $9 million to approximately $3 million. *See* Cal. State Budget 2021-22, Item 0855, Cal. Gambling Control Comm'n (RON Tab 315). There is no evidence the State repaid the misused SDF funds.

193.    As of the 2021-22 State budget, annual discretionary grant funds available from the TNGF total approximately $50 million. *See id*.

## VI.    Big Sandy's Efforts to Develop Class III Gaming on the McCabe Allotment.

194.    Big Sandy has conducted limited gaming at its Mono Wind Casino on the Big Sandy Rancheria since 1995.

195.    Under Section 4.2 of the 1999 Compact, Big Sandy may operate "not more than two Gaming Facilities" on "Indian lands on which gaming may lawfully be conducted under [IGRA]…." *See* 1999 Compact, § 4.2 (RON Tab 316).

196.    For years, Big Sandy has sought to operate a gaming facility on the McCabe Allotment. The State has resisted Big Sandy's efforts. The State's resistance includes its refusal

and failure, since 2008, to negotiate in good faith with Big Sandy to enter into a Tribal-State compact governing the conduct of class III gaming activities on the McCabe Allotment.

197.    On December 22, 2004, Big Sandy requested a legal opinion from the NIGC on whether the McCabe Allotment qualifies as Indian lands eligible for gaming under IGRA.  *See* 25 U.S.C. § 2703(4) ("Indian lands" includes "any lands title to which is … held in trust by the United States for the benefit of any Indian tribe or individual … and over which an Indian tribe exercises governmental power").  Big Sandy's request to the NIGC was, in part, made pursuant to its reliance on the State's then-recent declaration in the case of *Mechoopda Indian Tribe of Chico Rancheria v. Schwarzenegger*, No. Civ.S-03-2327WBS/GGH, 2004 WL 1103021 (E.D. Cal. Mar. 12, 2004), that the State had an "obligation under IGRA to negotiate a tribal-state gaming compact" when an NIGC legal opinion stated that trust land is eligible for class III gaming.  *See* Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss (Doc. 5) at 2, n.4 (Jan. 5, 2004) (RON Tab 298).

198.    On September 9, 2005, the State sent a letter to the NIGC challenging Big Sandy's request for the NIGC's opinion that the land was eligible for gaming under IGRA.  *See* Letter from Stephanie K. Shimazu, Off. of the Governor, to Penny J. Coleman, Acting Gen. Counsel, NIGC (Sept. 9, 2005) (RON Tab 304).  Specifically, the State (1) disputed whether Big Sandy exercises "exclusive jurisdiction over the land," and (2) claimed there was insufficient evidence to conclude that the Tribe has exercised "sufficient historic governmental power over the property."  Having worked closely with Table Mountain Rancheria, which owns a competing class III gaming facility within a few miles of the McCabe Allotment, the State submitted that "Table Mountain's claim to the McCabe Allotment precludes a determination that the property is Big Sandy's Indian lands."  Neither test, as manufactured by the State, is found within IGRA.

199.    On September 6, 2006, the NIGC issued a legal opinion entitled "Gaming By the Big Sandy Rancheria on the McCabe Allotment," after reviewing the evidence submitted by the State, Big Sandy, and other parties.  *See* Mem. from John R. Hay, Staff Att'y, NIGC, through P. Coleman, to Philip N. Hogen, Chairman, NIGC (Sept. 6, 2006) (RON Tab 303).  The NIGC concluded: "In our opinion, the McCabe trust allotment constitutes Indian lands under [IGRA].

Therefore, the Big Sandy Rancheria may conduct Class II and III gaming activities on the land." The legal opinion further stated that the "Department of the Interior, Office of the Solicitor concurs with this opinion."

200.    The NIGC's conclusion was based on its findings that the McCabe Allotment was held in trust for the benefit of a tribal member, that Big Sandy has jurisdiction over the allotment, and that Big Sandy exercises governmental power over the allotment.

201.    The United States has relied on the September 6, 2006, opinion that the McCabe Allotment constitutes Indian lands under IGRA as precedent to support its decisions in other cases. *See* United States' Br. as Amicus Curiae in Supp. of Defs.-Appellants (Doc. 21) at 14-15, n.7 (Jun. 3, 2016), *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618 (1st Cir. 2017) (RON Tab 142); Federal Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Cross-Mot. (Doc. 54) at 23, 35-39, 41 n.17 (Dec. 18, 2020), *Native Village of Eklutna v. U.S. Dep't of Interior*, No. 1:19-cv-02388-DLF, 2021 WL 4306110 (D.D.C. Sept. 22, 2021) (RON Tab 141).

202.    The State, in a letter to Big Sandy dated January 22, 2008, continued to dispute "whether the McCabe Allotment qualifies as the Tribe's Indian lands, as defined by IGRA." *See* Letter from A. Hoch to Connie Lewis, Chairperson, Big Sandy (Jan. 22, 2008) (RON Tab 2).  It refused to accept the NIGC's and the Department's legal opinion in 2006 that the McCabe Allotment constitutes Indian lands under IGRA, despite having told the court in *Mechoopda* that it had a duty to negotiate for class III gaming on trust land that the NIGC determined to be Indian lands under IGRA.

203.    Big Sandy met with the State on January 29, 2008, and discussed its continued plans to construct a class III gaming facility on the McCabe Allotment.

204.    On April 9, 2008, by letter to the State, Big Sandy requested the State enter into negotiations for a Tribal-State compact to amend or replace its 1999 Compact.  *See* Letter from R. Dilweg to A. Hoch (Apr. 9, 2008) (RON Tab 3).  Big Sandy specified the McCabe Allotment as the particular piece of land for its proposed gaming site.  Big Sandy emphasized its interest in a Tribal-State compact that would allow gaming on the McCabe Allotment (which Big Sandy called

the "Esteves Allotment" in its letter), and provided the State information regarding environmental and exploratory work underway on the McCabe Allotment. Big Sandy attached a proposed amendment to the 1999 Compact, seeking to address the regulation of class III gaming at a new tribal gaming facility on the McCabe Allotment. 2008 Amendment to the 1999 Tribal-State Gaming Compact Between the State of California and the Big Sandy Rancheria Band of Western Mono Indians (Big Sandy draft, Apr. 8, 2008) (RON Tab 4).

205. On October 15, 2008, by letter to the State, Big Sandy protested that the State was improperly refusing to negotiate for class III gaming activities on the McCabe Allotment. *See* Letter from R. Dilweg to A. Hoch (Oct. 15, 2008) (RON Tab 5). Big Sandy described numerous instances where the State had negotiated with other California Indian tribes for class III gaming on land which had not even been determined to be Indian lands under IGRA, such as (1) in 2004, negotiations with Fort Mojave for class III gaming on land acquired in trust by the United States in 1991 that was not determined to be gaming-eligible Indian lands; (2) in 2005, negotiations with Big Lagoon and Los Coyotes for class III gaming on land that was not yet Indian lands, contingent on the identified lands being taken into trust by the United States for gaming purposes, and (3) in 2008, negotiations with North Fork for class III gaming on land that was not yet Indian lands.

206. Specifically, the State and the North Fork Rancheria of Mono Indians negotiated and, in April 2008, signed a gaming compact that allowed North Fork to conduct class III gaming on a 305-acre parcel in Madera County that all parties acknowledged was not, at the time, Indian lands eligible for gaming. North Fork had requested that the United States take the land into trust for the tribe, and requested a "two-part determination" pursuant to 25 U.S.C. § 2719(b)(1)(A) that the land, once taken into trust, would be eligible for gaming. The two-part determination requires a decision by the Secretary and the concurrence of the Governor. The April 2008 gaming compact explained that in exchange for North Fork's agreement to the terms of that compact – including taxes of 13.5% to 22% imposed on North Fork's net gaming revenues and other impermissible terms – the Governor would concur in the decision to make the parcel eligible for gaming. *See* Tribal-State Compact Between the State of California and the North Fork Rancheria of Mono

Indians of California (April 2008) (RON Tab 327). Notably, the Secretary's subsequent favorable decision, issued on September 1, 2011, states that North Fork did not own the property. *See* Letter from Larry Echo Hawk, Assistant Secretary – Indian Affairs, to J. Brown (Sept. 1, 2011) at 5, 10-11 (RON Tab 338). The Governor delivered his concurrence as promised on August 30, 2012, together with a revised gaming compact. A California court later determined in 2021 that voters had annulled the Governor's concurrence when they rejected the legislative ratification of the 2012 gaming compact, calling into question the land's eligibility for gaming. *Stand Up for California! v. California*, 64 Cal.App.5th 197 (Cal. Ct. App. 2021). The State, however, agreed to settle litigation and clear the path for North Fork to open a casino there on the condition that North Fork pay even more money to local governments. *See* Letter from the Tribal Council of North Fork Rancheria of Mono Indians of California to Tribal Citizens (Mar. 31, 2022) (RON Tab 307).

207.    In a letter to Big Sandy dated November 13, 2008, the State responded that IGRA does not require it to negotiate in good faith for a compact amendment that includes the McCabe Allotment. *See* Letter from A. Hoch to R. Dilweg (Nov. 13, 2008) (RON Tab 6). The State rejected Big Sandy's request to negotiate for class III gaming on the McCabe Allotment, stating that it was instead only willing to negotiate for gaming within the boundaries of Big Sandy's Rancheria where its Mono Wind Casino was already located. Contrary to the State's previous actions, the State demanded that there be "final agency action" from the federal government affirming Big Sandy's right to conduct class III gaming on the McCabe Allotment before it would negotiate for gaming on the McCabe Allotment.

208.    In 2011, the State began negotiating a Tribal-State compact with the Estom Yumeka Maidu Tribe of the Enterprise Rancheria, when that tribe's gaming site was not yet in trust or eligible for gaming, and its request for a "two-part determination" pursuant to 25 U.S.C. § 2719(b)(1)(A) was pending. *See Estom Yumeka Maidu Tribe of the Enterprise Rancheria of California v. California*, 163 F.Supp.3d 769, 772-74 (E.D. Cal. 2016). According to the Tribe's account, and similar to the North Fork circumstances, "the Governor indicated that he was giving serious consideration to concurring in the Secretary's determination, but only if the Tribe would

first agree to negotiate and enter into a tribal-state compact that provided the State and its residents with the same or similar protections as other compacts in California." *Id.* at 773-74. As with North Fork, on August 30, 2012, the Governor gave his concurrence that the parcel was gaming eligible and signed the Tribal-State compact. *Id.* at 774. The parcel was taken into trust nine months after the Tribal-State compact was signed. *Id.*

209. In its 2016 brief to the California Fifth Appellate District in the case challenging the Governor's authority to concur in North Fork's "two part determination," the State conceded that "the California Constitution does not prohibit the Governor from negotiating and executing a tribal-state class III gaming compact for a particular location before the Secretary takes that land into trust. Instead, the California Constitution limits the conduct of class III gaming to Indian lands pursuant to a compact ratified by the Legislature – irrespective of when the lands in question became Indian lands. … Accordingly, no language in Section 19 mandates any particular timing sequence for when the lands under consideration for a class III gaming compact could become the subject of negotiation." *See* State Respondents' Supplemental Brief at *6 (Sept. 16, 2016), 2016 WL 4994743 (citation omitted), *Stand Up for California! v. California*, 64 Cal.App.5th 197 (Cal. Ct. App. 2021) (RON Tab 306). Thus, the State asserted in court proceedings that it is obligated to negotiate for class III gaming on Indian lands without regard to a final determination by the United States that such lands are eligible for class III gaming. Such assertions by the State to the court are contrary to its statements in negotiations with Big Sandy.

210. When substantive negotiations resumed after the State's extended refusal to negotiate for class III gaming on the McCabe Allotment, Big Sandy was explicit that the Tribal-State compact must include gaming on the McCabe Allotment. During a compact negotiation session on September 3, 2021, the State told Big Sandy that it believed the issue was settled by the NIGC, and that the State would defer to the NIGC's determination.

211. In each subsequent negotiation session, Big Sandy raised the issue of the McCabe Allotment as a central issue for negotiation.

212.    In a compact negotiation session on October 6, 2021, the State again stated that it generally defers to the NIGC's determination of whether a parcel is eligible for tribal gaming.

213.    On October 13, 2021, by letter to the State, Big Sandy provided supplemental information showing that the McCabe Allotment constituted "Indian lands" as defined by IGRA, and that the McCabe Allotment was eligible for Big Sandy to conduct class III gaming there.  *See* Letter from Derril B. Jordan, Att'y, Big Sandy, to N. Voegeli (Oct. 13, 2021) (RON Tab 138).  Big Sandy demonstrated that the United States has relied upon the 2006 legal opinion of the NIGC declaring the "Indian lands" status of the McCabe Allotment.

214.    On October 19, 2021, in an email discussion the State acknowledged Big Sandy's "key interest in including the McCabe Allotment as land eligible for gaming under the compact." *See* E-mail from N. Voegeli to J. Peebles (Oct. 19, 2021, 6:42 p.m.) (RON Tab 143).

215.    On November 29, 2021, the State sent a revised draft Tribal-State compact to Big Sandy in which it deleted the Tribe's proposed declarations in the compact preamble that established the Tribe's economic need to develop a larger gaming facility on the McCabe Allotment.  *See* Tribal-State Compact, State's draft (Nov. 29, 2021) (RON Tab 159).

216.    The State's November 29, 2021 email to Big Sandy posed several questions regarding the McCabe Allotment, suggesting that the State was not inclined to rely on the NIGC's September 6, 2006 legal opinion.  *See* E-mail from N. Voegeli to J. Peebles (Nov. 29, 2021, 5:35 p.m.) (RON Tab 158).

217.    In an email to the State on November 30, 2021, Big Sandy stated its understanding that the State would defer to the NIGC's 2006 legal opinion.  *See* E-mail from J. Peebles to N. Voegeli (Nov. 30, 2021, 11:19 a.m.) (RON Tab 164).

218.    The State responded by email to Big Sandy on November 30, 2021, and explained that it was "unclear whether the Department of the Interior has made a formal decision on the allotment's gaming eligible status."  *See* E-mail from N. Voegeli to J. Peebles (Nov. 30, 2021, 2:58 p.m.) (RON Tab 165).

219.    In response, by email to the State on November 30, 2021, Big Sandy emphasized that "the McCabe [A]llotment issue is central to the Tribe's proposed compact." *See* E-mail from J. Peebles to N. Voegeli (Nov. 30, 2021, 6:25 p.m.) (RON Tab 166).

220.    During a negotiation session on December 2, 2021, the State suggested it may not be willing to include the McCabe Allotment in a compact unless the federal government took final agency action affirming that gaming may be conducted on the McCabe Allotment.

221.    On January 4, 2022, by email to the State, Big Sandy asked the State to declare its final position on Big Sandy's plans to locate a gaming facility on the McCabe Allotment. *See* E-mail from P. Bergin to N. Voegeli (Jan. 4, 2022, 4:07 p.m.) (RON Tab 174).

222.    The State responded by reply email on January 5, 2022, that the status of the McCabe Allotment "appears unresolved" and the State demanded a final appealable action by a federal agency before it would begin negotiation for class III gaming on the McCabe Allotment. *See* E-mail from N. Voegeli to P. Bergin (Jan. 5, 2022, 4:59 p.m.) (RON Tab 177).

223.    Following a compact negotiation session on January 6, 2022, the State advised Big Sandy in an email on January 8, 2022, that the State was "continuing its due diligence" on issues regarding the McCabe Allotment. *See* E-mail from N. Voegeli to J. Peebles (Jan. 8, 2022, 8:10 a.m.) (RON Tab 178).

224.    On January 19, 2022, by letter to the State, Big Sandy again requested the State's final decision regarding whether it would negotiate for class III gaming on the McCabe Allotment, and for the State to provide the basis for any refusal to negotiate. *See* Letter from P. Bergin to N. Voegeli (Jan. 19, 2022) (RON Tab 182).

225.    Responding by email on January 27, 2022, the State declared it "is not averse to including the McCabe allotment in the compact," but stated again that it "must conduct its due diligence" on the matter. *See* E-mail from N. Voegeli to J. Peebles (Jan. 27, 2022, 4:27 p.m.) (RON Tab 188).

226.    On February 7, 2022, by reply letter the State reiterated its intention to "conduct its own due diligence" regarding the status of the McCabe Allotment, as it "considers the issue

unresolved," despite also stating that "the State generally looks to the federal government for final determinations of whether a parcel is eligible for a tribe's gaming" and acknowledging that the NIGC concluded in 2006 that the McCabe Allotment constituted Big Sandy's Indian lands. *See* Letter from N. Voegeli to P. Bergin (Feb. 7, 2022) (RON Tab 190). The State suggested that the McCabe Allotment is Indian lands of another Indian tribe (presumably at the prompting of Table Mountain). The State emphasized its view that only a final agency action by the federal government which depended upon a determination of the McCabe Allotment's status as Big Sandy's Indian lands would trigger the State's obligation to negotiate a Tribal-State compact allowing Big Sandy to conduct gaming there. In describing its position, the State recounted its attempt in 2006 to challenge the NIGC's 2006 legal opinion, revealing that its current aim was to challenge, not defer to, any final agency action that affirmed the status of the McCabe Allotment as Indian lands.

227. In its February 7, 2022, letter the State discussed several alternative conditions for the negotiation of a Tribal-State compact that would allow gaming on the McCabe Allotment. These potential conditions were: (i) that the Tribe complete a transfer of the present allottee's trust interest to the Tribe through a pending federal probate action; (ii) that the Tribe lease the property from the allottee, which would require federal approval and thus involve a final agency action; (iii) that the Tribe notify the NIGC of its intention to issue a license for a gaming facility on the property as a potential trigger for NIGC review that may constitute final agency action; (iv) that pursuant to language in section 4.2 of the State's draft compact, the Secretary's approval of the Tribal-State compact would constitute final agency action that confirmed the McCabe Allotment is eligible for gaming by Big Sandy; and (v) that the State and Big Sandy jointly request a final determination by the Department or NIGC as to whether the McCabe Allotment is eligible for gaming by Big Sandy. The State advised that it would "commit to abide by a final determination by Interior or the NIGC on this matter in response to a joint Tribe-State request."

228. By letter to the State dated February 9, 2022, Big Sandy provided the State with language modifying section 4.2 of the draft Tribal-State compact that would ensure that the

Secretary's approval of the Tribal-State compact would concurrently approve class III gaming on the McCabe Allotment.  *See* Letter from P. Bergin to N. Voegeli (Feb. 9, 2022) (RON Tab 191).

229.    On February 10, 2022, Big Sandy and the State held negotiations by videoconference.  They discussed Big Sandy's proposed revision to section 4.2 of the draft Tribal-State compact.  The State expressed concern with Big Sandy's proposal, because it may not limit the Tribe's class III gaming to "gaming-eligible Indian lands."  Big Sandy acknowledged the State's concern and committed to inserting "gaming-eligible" into its proposed revision to section 4.2.

230.    On March 4, 2022, the State responded by letter to Big Sandy's February 9, 2022, proposed revision to section 4.2 of the Tribal-State compact.  *See* Letter from N. Voegeli to J. Peebles and P. Bergin (Mar. 4, 2022) (RON Tab 198).  The State's response ignored Big Sandy's commitment to limit the Tribe's class III gaming to "gaming-eligible Indian lands."  Instead, the State rescinded its prior offer, declaring: "the State does not think that it is appropriate to commit to language in the compact describing the McCabe allotment as eligible for gaming by the Tribe when the State considers that issue unresolved and before there has been a final agency action or final determination by the [Secretary] or the NIGC."

231.    In its March 4, 2022, letter the State also proposed an additional condition on the McCabe Allotment's eligibility for gaming by Big Sandy.  The State demanded that a majority interest in the McCabe Allotment be held in trust by the United States for the benefit of Big Sandy before the Tribe would be allowed to conduct class III gaming on gaming-eligible Indian lands.  The State also expressed agreement with Big Sandy's position, based on previous NIGC memoranda, that Big Sandy's acquisition of a trust interest in the McCabe Allotment would not "run afoul of IGRA's prohibition against gaming on lands acquired by the Tribe after the passage of IGRA."  However, the State also demanded that Big Sandy give special advance notice to the State ninety days before the Tribe either (1) begins construction of a Gaming Facility on the McCabe Allotment, or (2) notifies the NIGC that the Tribe is considering issuing a license for a Gaming Facility on the McCabe Allotment.

232.    In its March 4, 2022, letter the State further retreated from its prior position concerning the McCabe Allotment.  The State declared that: "inclusion of lands under subdivision (b)(2) [referring to the McCabe Allotment] is not intended, and should not be interpreted, as establishing any view or position by the State as to the eligibility of Class III Gaming to be conducted by the Tribe on the land described…."  The State expressed concern that the Tribal-State compact could be Deemed Approved by operation of law, and "the State is not confident that such a deemed approval could appropriately be considered a final agency action."

233.    In its March 4, 2022, letter the State also manufactured a third test for whether it would negotiate for class III gaming on Big Sandy's Indian lands.  The State declared that the McCabe Allotment must be "clearly eligible for gaming by the Tribe."

234.    On March 14, 2022, by letter to the State, Big Sandy restated its proposed revision to section 4.2 of the Tribal-State compact, including inserting "gaming-eligible" to qualify Indian lands.  *See* Letter from J. Peebles to N. Voegeli (Mar. 14, 2022) (RON Tab 206).  Big Sandy explained that the "revised language completely satisfies the State's concern that the Tribe conduct class III gaming only on gaming-eligible Indian lands without improperly restricting gaming to lands held in trust for the Tribe itself."

235.    On March 23, 2022, Big Sandy and the State negotiated by videoconference.  The State declared that it has no obligation to negotiate for class III gaming on any particular parcel of gaming-eligible Indian land.  The State refused Big Sandy's proposed revision to section 4.2 of the Tribal-State compact that would include the McCabe Allotment as gaming-eligible Indian lands.  The State agreed to entertain an amendment to section 4.2 to condition class III gaming on the McCabe Allotment only on the Secretary's affirmative approval of the Tribal-State compact.

236.    During the March 23, 2022, negotiation the State later declared, however, that it did not intend to negotiate for a Tribal-State compact that could receive the Secretary's affirmative approval.  Instead, the State declared that it only intends to negotiate for a Tribal-State compact that would be Deemed Approved.

237.    By letter to Big Sandy dated March 30, 2022, the State refused to agree to the Tribe's proposed section 4.2 language.  *See* Letter from N. Voegeli to J. Peebles (Mar. 30, 2022) (RON Tab 224).  The State reiterated that it "must conduct its due diligence" in "situations where there is uncertainty as to the ability of a tribe to lawfully conduct gaming on a particular parcel." Once again, the State advised Big Sandy that gaming could be authorized only on lands the State considers "clearly eligible for gaming by the Tribe" at the time of compact negotiations.

238.    On April 13, 2022, by letter to the State, Big Sandy further detailed the status of the McCabe Allotment and the State's statutory obligation to negotiate for class III gaming without creating "artificial obstacles for the Tribe."  *See* Letter from J. Peebles to N. Voegeli (Apr. 13, 2022) (RON Tab 229).

239.    In the State's draft Tribal-State compact of April 22, 2022, the State continued to demand that Big Sandy obtain a majority interest in the McCabe Allotment before it would be allowed to conduct class III gaming thereon.  *See* Tribal-State Compact, State's draft, § 4.2 (Apr. 22, 2022) (RON Tab 278).

240.    By letter dated May 17, 2022, the State reiterated its view that "[t]he issue is whether the McCabe allotment is eligible for gaming by the Tribe," and that "the State does not think that this issue is resolved because the 2006 memorandum by the [NIGC Office of General Counsel] was an advisory opinion that was not acted upon by the NIGC or Interior."  *See* Letter from N. Voegeli to J. Peebles (May 17, 2022) (RON Tab 324).

241.    On June 22, 2022, the Chairman of the NIGC approved Big Sandy's amended class III gaming ordinance.  *See* Notice of Approved Class III Tribal Gaming Ordinance, 87 Fed. Reg. 38778 (June 29, 2022).  As the Chairman's approval explained, the approved class III gaming ordinance "contains a site-specific section that describes the original allotment of Mary McCabe (the 'McCabe Allotment') as land within which the Tribe is authorized to conduct gaming.  This section required the NIGC to consider whether the McCabe Allotment would constitute Indian lands on which the Tribe may conduct gaming activities under [IGRA].  On May 13, 2022, the NIGC Office of General Counsel issued a legal opinion concluding that the McCabe Allotment

constitutes Indian lands on which the Tribe may conduct such gaming.  On May 17, 2022, the Department of the Interior, Office of the Solicitor, issued its concurrence with that opinion." *Id.* at 38778.  The Chairman adopted the legal opinion in full to support his approval of the gaming ordinance. *Id.*

242.  Big Sandy promptly informed the State of the Chairman's approval decision and the legal opinion again confirming the McCabe Allotment's status as Indian lands eligible for class III gaming by Big Sandy.  *See* Letter from J. Peebles to N. Voegeli (June 23, 2022) (RON Tab 318); Letter from E. Sequoyah Simermeyer, Chairman, NIGC, to E. Kipp (June 22, 2022) (RON Tab 319); Memorandum to the Chair from Austin Badger, Sr. Atty., NIGC, through Michael Hoenig, Gen. Counsel, NIGC, and Sharon M. Avery, Assoc. Gen. Counsel, NIGC (May 13, 2022) (RON Tab 320).

243.  Big Sandy and the State held a Tribal-State compact negotiation session by videoconference on June 28, 2022.  During the meeting, the State declared that it remained uncertain about the McCabe Allotment's Indian lands status.  The State still refused to agree to compact provisions that would allow Big Sandy to conduct class III gaming on the McCabe Allotment.  *See* E-mail from N. Voegeli to J. Peebles (July 5, 2022, 4:04 p.m.) (RON Tab 328); Letter from J. Peebles to N. Voegeli (July 6, 2022) (RON Tab 329).

## VII.    Extension of the 1999 Compact.

244.  Section 11.2.1(a) of the 1999 Compact provides that if the parties have not agreed to extend the 1999 Compact or enter into a new Tribal-State compact by the expiration date of December 31, 2020, then the 1999 Compact is automatically extended to June 30, 2022.  *See* 1999 Compact, § 11.2.1(a), as modified by Modification No. 4 (RON Tab 316).  Big Sandy's 1999 Compact was automatically extended under this provision.

245.  On January 26, 2022, the State sent letters to the Indian tribes with which it was conducting gaming compact negotiations, including Big Sandy, stating that the State was willing, upon written request by the Tribe, to amend the 1999 Compact solely to extend its termination date by one year, to June 30, 2023, on the basis of "uncertainty" created by the Disapproval Letters.

Such amendment would require ratification by the California Legislature, according to the State. *See* Letter from N. Voegeli to E. Kipp (Jan. 26, 2022) (RON Tab 186).

246.    Big Sandy responded to the State's offer on February 9, 2022.  *See* Letter from P. Bergin to N. Voegeli (Feb. 9, 2022) (RON Tab 191).  Big Sandy explained that a new Tribal-State compact that would take effect before the June 30 expiration of the 1999 Compact would provide Big Sandy the firm commitment for an extended compact period that is necessary for Big Sandy to arrange financing for the planned gaming facility development on the McCabe Allotment, and that sufficient time remained to conclude a new compact, "[g]iven that prior compacts have been ratified by the legislature within a week," while an extension of only one year provided little benefit.  Big Sandy requested negotiations for the length of an extension of the 1999 Compact and suggested five years as a minimally appropriate extension based on its unique circumstances.

247.    On March 8, 2022, by letter to Big Sandy, the State renewed its previous offer of January 26, 2022 for a one-year extension of the term of the 1999 Compact.  *See* Letter from N. Voegeli to E. Kipp (Mar. 8, 2022) (RON Tab 201).  The State requested that the Tribe execute a form amendment the State had negotiated with other Indian tribes "no later than April 22, 2022."

248.    On March 14, 2022, Big Sandy addressed the State's offer of a one-year extension to the 1999 Compact.  *See* Letter from P. Bergin to N. Voegeli (Mar. 14, 2022) (RON Tab 205).  The Tribe proposed a five-year extension, explaining that although it preferred to conclude a new gaming compact prior to June 30, 2022, the Tribe was amenable to a five-year extension.

249.    Big Sandy reiterated by letter on March 21, 2022 its proposal to extend the 1999 Compact for five years, explaining how an extension of only one year would adversely impact the Tribe's effort to raise capital for the casino project on the McCabe Allotment.  *See* Letter from P. Bergin to N. Voegeli (Mar. 21, 2022) (RON Tab 219).

250.    On March 22, 2022, by letter to Big Sandy, the State rejected the Tribe's counter-offer for a five-year extension of the 1999 Compact.  *See* Letter from N. Voegeli to P. Bergin (Mar. 22, 2022) (RON Tab 221).  According to its letter, the State had "reached agreement with other tribes for a one-year extension and is not willing to agree to an amendment to extend the Tribe's

1999 Compact for a term longer than one year." The State insisted that the Tribe execute the form amendment without material changes by April 22, 2022, if it wanted any extension to the 1999 Compact.

251.    On March 23, 2022, by letter to the State, Big Sandy detailed the State's affirmative interference with Big Sandy's legal right to conduct class III gaming on the McCabe Allotment. *See* Letter from P. Bergin to N. Voegeli (Mar. 23, 2022) (RON Tab 222).  The Tribe encouraged the State to reconsider its summary rejection of the Tribe's counter-offer in negotiations regarding an extension to the 1999 Compact.

252.    On April 13, 2022, after the State had agreed to extend the 1999 Compacts of other Indian tribes for 18 months, until December 31, 2023, the State offered Big Sandy the same non-negotiable extension.  *See* Letter from N. Voegeli to J. Peebles (Apr. 13, 2022) (RON Tab 264). With the impending expiration of its 1999 Compact, Big Sandy agreed to the extension.  *See* Letter from J. Peebles to N. Voegeli (Apr. 19, 2022) (RON Tab 270).  The amendment extending the 1999 Compact was ratified by the California Legislature on May 31, 2022, and took effect upon its publication in the Federal Register on June 30, 2022.  *See* Indian Gaming: Extension of Tribal-State Class III Gaming Compacts in California, 87 Fed. Reg. 39115 (June 30, 2022).

**VIII.   The State's Conduct Harms Big Sandy.**

253.    As a result of the State's conduct described herein, the State and Big Sandy have not entered into a new Tribal-State compact under 25 U.S.C. § 2710(d)(3).

254.    The State's conduct has denied Big Sandy its statutory right under IGRA to engage in negotiations conducted by the State in good faith for a Tribal-State compact, in violation of the State's statutory duty to Big Sandy.

255.    The State's conduct impairs Big Sandy's right under IGRA to operate class III gaming on its Indian lands, harms its ability to develop a new facility for class III gaming, and infringes upon its inherent right to engage in activities on its Indian lands that are not directly related to gaming without State interference.

256.    Absent the requested relief, Big Sandy will be unable to enter into a new Tribal-State compact that can be approved by the Secretary prior to the expiration of Big Sandy's 1999

Compact, and Big Sandy will be compelled to cease gaming at that time or be subject to federal prosecution for violating California and federal gambling laws.

257.    As a result of the State's conduct, Big Sandy faces the loss of gaming revenues which are essential to the effective operation of the Tribal government, infringing upon Big Sandy's right to self-governance and diminishing its capacity for self-sufficiency.

### FIRST CLAIM FOR RELIEF

### Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand to Negotiate a Tribal-State Compact that Cannot be Affirmatively Approved by the Secretary

258.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

259.    Under 25 U.S.C. § 2710(d)(8)(B), the Secretary has no discretion to disapprove a Tribal-State compact that complies with IGRA, other federal law, and the United States' trust obligations to Indians.

260.    During negotiations on March 23, 2022, the State declared that it does not intend to negotiate a Tribal-State compact with Big Sandy that can be affirmatively approved by the Secretary, but intends to negotiate one that would be Deemed Approved.

261.    The State therefore is demanding that Big Sandy accept provisions in a Tribal-State compact that do not comply with IGRA, because the Secretary would be able to affirmatively approve the compact if all of the provisions of the compact were to comply with IGRA, and nothing in the compact were to violate other federal laws or the federal trust obligations.

262.    The State has a consistent history of failing to comply with the Secretary's analysis, directions and concerns in Disapproval Letters and Deemed Approved Letters regarding compact provisions that violate IGRA or where the interpretation and implementation of such provisions may violate IGRA.

263.    The State's demand that Big Sandy agree to a Tribal-State compact that cannot be affirmatively approved by the Secretary, but can only be Deemed Approved or disapproved, is a failure to conduct negotiations in good faith, in violation of 25 U.S.C. § 2710(d)(3).

**SECOND CLAIM FOR RELIEF**

**Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demands for Unlawful Compact Provisions**

264.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

265.    In 25 U.S.C. § 2710(d)(3)(C)(i)-(vii), Congress set forth an exhaustive list of the subjects to which the provisions of a Tribal-State compact may relate.

266.    IGRA's requirement that the State negotiate in good faith requires the State to adhere to the interpretation of IGRA in the Secretary's Disapproval Letters, Deemed Approved Letters, and guidance letters, when the State engages in negotiations for a Tribal-State compact. Big Sandy's Tribal-State compact must conform to the Secretary's interpretation of IGRA because the compact cannot become effective without the Secretary's approval, whether by affirmative approval or allowing the compact to be Deemed Approved, under 25 U.S.C. §§ 2710(d)(3)(B) and 2710(d)(8).

267.    IGRA's requirement that the State negotiate in good faith also requires the State, in Tribal-State compact negotiations, to adhere to decisions from the federal courts, such as in *Chicken Ranch*, to the extent such decisions interpret whether compact provisions demanded or proposed by the State are permitted in a lawful Tribal-State compact.

268.    The State has demanded Unlawful Compact Provisions and provisions that exceed the limited scope of State regulation permitted under IGRA.   The State's demand for these Unlawful Compact Provisions violates IGRA in two primary ways:

A.    Scope of Regulation.  The State has ignored repeated and consistent direction from the Secretary that only matters <u>directly related to the operation of class III gaming activities</u> may be regulated by a Tribal-State gaming compact.  As described in the Secretary's Disapproval Letters, all of the gaming compacts the State has proposed as drafts or templates for negotiation improperly substituted "but for" and "principal purpose" tests for the "directly related" criterion that Congress expressly provided in 25 U.S.C. § 2710(d)(3)(C)(vii).  The State's proposed provisions to

regulate matters that are not directly related to the operation of class III gaming activities are unlawful under 25 U.S.C. § 2710(d)(3)(C).

B.    Failure to Offer Meaningful Concessions.    Even if the Unlawful Compact Provisions were to fall within IGRA's permissible subjects of negotiation, the State has not offered any commensurate concessions that are meaningful to Big Sandy as consideration for such provisions, in violation of IGRA.

269.    The State has never wavered from its attempt to impose Unlawful Compact Provisions outside the permissible scope of a Tribal-State compact.  Big Sandy has proposed revisions to the Tribal-State compact draft to remove the Unlawful Compact Provisions.  The State has refused to accept Big Sandy's proposed revisions.

270.    By insisting that Big Sandy agree to the Unlawful Compact Provisions, and provisions that exceed the permissible scope of a Tribal-State compact, the State has failed to negotiate with Big Sandy in good faith to enter into a Tribal-State compact, in violation of Section 2710(d)(3).

## THIRD CLAIM FOR RELIEF

**Failure to Negotiate in Good Faith in Violation of 25 U.S.C. §§ 2710(d)(3) and 2710(d)(4): The State's Demands for Revenue Sharing and Attempts to Impose a Prohibited Tax, Fee, Charge, or Other Assessment upon Big Sandy**

271.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

272.    In 25 U.S.C. § 2710(d)(4), Congress specifically prohibited a State and its political subdivisions from imposing any tax, fee, charge, or other assessment upon an Indian tribe or any other person or entity authorized by an Indian tribe to engage in class III gaming activity, except for assessments necessary to defray the State's costs of regulating the tribe's class III gaming activity that may be agreed to in a Tribal-State compact under Section 2710(d)(3)(C)(iii).  Section 2710(d)(4) further provides that the State must not refuse to negotiate a class III gaming Tribal-State compact based upon such lack of authority to impose a tax, fee, charge, or other assessment.

273.    The State demanded that Big Sandy make payments that are not necessary to defray the State's costs of regulating Big Sandy's class III gaming activity.  Such payments constitute a tax, fee, charge, or other assessment under 25 U.S.C. § 2710(d)(4).

274.    Under 25 U.S.C. § 2710(d)(7)(B)(iii)(II), the Court "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith."

275.    The State has not offered concessions that are meaningful to Big Sandy as consideration for such payments.

276.    The State's failure to offer meaningful concessions as consideration for its payment demands is further evidence that the State seeks not to negotiate, but rather to impose, a tax, fee, charge, or other assessment upon Big Sandy in violation of 25 U.S.C. § 2710(d)(4).

277.    The State's failure to offer meaningful concessions as consideration for its payment demands is further evidence that the State has not negotiated in good faith.

278.    The State's attempt to impose these taxes, fees, charges, or other assessments is a failure to negotiate with Big Sandy in good faith, in violation of 25 U.S.C. § 2710(d)(3).

**FOURTH CLAIM FOR RELIEF**

**Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand for Tribal-State Compact Provisions that Require Big Sandy to Enter into Separate Intergovernmental Agreements**

279.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

280.    The State's demand that Big Sandy execute and comply with subsequent intergovernmental agreements with the County of Fresno and with Caltrans containing additional terms not specified in the Tribal-State compact as a mandatory condition of Big Sandy's operation of class III gaming on its Indian lands violates IGRA's requirement that the class III gaming compact be negotiated between the Tribe and the State.

281.    The State's demand that Big Sandy execute and comply with subsequent intergovernmental agreements with the County of Fresno and with Caltrans as a mandatory condition of Big Sandy's operation of class III gaming on its Indian lands circumvents IGRA's

requirement that each compact and compact amendment be reviewed by the Secretary, and prevents the Secretary from ensuring that the provisions of such future agreements do not violate IGRA, federal law, or the Secretary's trust responsibility.

282.    The State's demand that Big Sandy execute and comply with subsequent intergovernmental agreements with the County of Fresno and with Caltrans would impose additional undefined conditions upon Big Sandy's ability to engage in activities that are not directly related to its operation of class III gaming, exceeding the permissible scope of a Tribal-State compact.

283.    The State's demands for compact provisions that would require Big Sandy to enter into separate agreements with entities other than the State as a condition of engaging in gaming activities, and without Secretarial approval of such agreements, and in excess of the permissible scope of a Tribal-State compact, constitutes a failure to conduct negotiations with Big Sandy in good faith, in violation of 25 U.S.C. § 2710(d)(3).

### FIFTH CLAIM FOR RELIEF

### Refusal to Negotiate and Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Refusal to Negotiate for Class III Gaming on the McCabe Allotment

284.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

285.    IGRA requires the State to negotiate in good faith for a Tribal-State compact governing the conduct of gaming on the gaming-eligible Indian lands within the jurisdiction of Big Sandy, which include the McCabe Allotment.

286.    The status of the McCabe Allotment as Indian lands eligible for gaming by Big Sandy was confirmed by the NIGC's 2006 legal opinion, in which the Department of the Interior concurred, and confirmed again by the NIGC's 2022 legal opinion, in which the Department of the Interior again concurred and which was the basis for the NIGC Chairman's approval of Big Sandy's class III gaming ordinance.

287.    The State refused to negotiate a Tribal-State compact that would govern the conduct of class III gaming activities on the McCabe Allotment.

288.    The State's refusal was based on its claim that the McCabe Allotment's status was unresolved. The State did not express to Big Sandy any reason to conclude, contrary to the NIGC's legal opinions, that the property was not Indian lands or was otherwise ineligible for gaming. The State expressed to Big Sandy no reason directly related to the operation of gaming activities for its refusal to agree to a Tribal-State compact that would allow Big Sandy to conduct class III gaming activities on the McCabe Allotment without including unlawful conditions, such as a requirement for a final agency action, or an obligation to obtain preclearance from the State, or Big Sandy's majority ownership of the parcel.

289.    The State's refusal to negotiate a Tribal-State compact governing the conduct of class III gaming activities on the McCabe Allotment without the imposition of unlawful conditions constitutes a failure to negotiate with Big Sandy and a failure to conduct negotiations in good faith, in violation of 25 U.S.C. § 2710(d)(3)(A).

## SIXTH CLAIM FOR RELIEF
### Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3): The State's Tactic of Delay and Deadlines

290.    Big Sandy incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

291.    Under 25 U.S.C. § 2710(d)(3)(A), once Big Sandy has requested the State negotiate for the purpose of entering into a Tribal-State compact governing the conduct of class III gaming activities on Indian lands over which Big Sandy has jurisdiction, the State is required to negotiate with Big Sandy in good faith to enter into such a compact.

292.    Big Sandy has been attempting to negotiate a replacement to its 1999 Compact since April 2008, when Big Sandy requested negotiations.

293.    Big Sandy has successfully conducted class III gaming under its 1999 Compact for more than twenty years. It began negotiations with the State by offering modest revisions to that successful 1999 Compact. The State refused the Tribe's offer. Instead, the State demanded that Big Sandy begin negotiations with Tribal-State compacts the State had negotiated with another Indian tribe. Each of those Tribal-State compacts contained Unlawful Compact Provisions. When

Big Sandy removed the Unlawful Compact Provisions in drafts it returned to the State, the State ignored Big Sandy's revisions or re-inserted the Unlawful Compact Provisions.

294.    Throughout the negotiations, including after June 30, 2018, when the 1999 Compact required the State to begin negotiating a replacement Tribal-State compact, the State has repeatedly delayed negotiations and redirected Big Sandy between numerous Tribal-State compacts it had negotiated with other Indian tribes.  The State has failed throughout negotiations to meaningfully negotiate provisions to allow gaming on the McCabe Allotment.  In October 2021, the State imposed a deadline to conclude negotiations by January 2022 and advised Big Sandy that any changes to a large portion of the Tribal-State compact template would result in missing the deadline and Big Sandy would not have a Tribal-State compact authorizing it to conduct class III gaming when its 1999 Compact expired.  The State drove Big Sandy toward the expiration of its 1999 Compact to force the Tribe to accept the Unlawful Compact Provisions.  In November 2021, when the Secretary disapproved three of the State's Tribal-State compacts, which contained the same Unlawful Compact Provisions it was imposing on Big Sandy, the State simply "disagreed with" the Secretary's decisions and continued its effort to impose Unlawful Compact Provisions on Big Sandy.

295.    To gain time for the Secretary to reconsider the Disapproval Letters or the Ninth Circuit to reverse *Chicken Ranch*, the State offered all Indian tribes operating under the 1999 Compacts, including Big Sandy, a one-year extension of those compacts.  The State presented its offer as not subject to negotiation.  The State flatly rejected Big Sandy's request for a longer extension that would meet its particular circumstances.  Ultimately, the State met the demands of other Indian tribes for an extension of eighteen months, and offered Big Sandy the same non-negotiable terms.  Facing the impending expiration of its 1999 Compact, Big Sandy agreed.

296.    Meanwhile, although the State expressly disagreed with the Secretary's reasoned interpretation of IGRA, as expressed in the Disapproval Letters, the State rejected Big Sandy's request to jointly obtain technical assistance from the Secretary to enable the parties to conclude a Tribal-State compact the Secretary could approve.  Instead, the State continued to insist on the Unlawful Compact Provisions in defiance of the Secretary and IGRA.

297.    The State used delay and redirection to pressure Big Sandy into accepting the Unlawful Compact Provisions by threatening the Tribe with expiration of its Tribal-State compact without a replacement compact in effect, which would subject the Tribe's class III gaming operation to closure.

298.    The State's tactic of delay and redirection in the face of the 1999 Compact's imminent expiration, while failing to address any of Big Sandy's substantive ongoing concerns, violates the requirement in IGRA, 25 U.S.C. § 2710(d)(3)(A), that the State negotiate with the Tribe in good faith to conclude a Tribal-State compact.

## REQUEST FOR RELIEF

WHEREFORE, Pursuant to its claims and causes of action alleged herein, Big Sandy prays for judgment as follows:

1.    Declaring that the State failed to conduct negotiations with Big Sandy in good faith for the purpose of entering into a Tribal-State compact in violation of 25 U.S.C. § 2710(d)(3)(A);

2.    Declaring that the State's demand that Big Sandy agree to a Tribal-State compact that cannot be affirmatively approved, but only Deemed Approved or disapproved, is a failure to conduct negotiations in good faith;

3.    Declaring that each of the Unlawful Compact Provisions described herein exceed the permissible scope of a Tribal-State compact under 25 U.S.C. § 2710(d)(3)(C), and the State's demands for such provisions violated its duty under IGRA to conduct Tribal-State compact negotiations in good faith:

   a.    Overbroad definitions of the terms Gaming Employees, Gaming Facility, Gaming Operation, and Project;

   b.    Overbroad environmental review and mitigation provisions;

   c.    Mandatory intergovernmental agreements with unspecified terms, unapproved by the Secretary, as a condition of engaging in gaming activities;

   d.    Overbroad employee licensing requirements;

   e.    Overbroad employment regulations;

1      f.      Regulation of food and beverage handling;

2      g.      Regulation of water quality; and

3      h.      Overbroad regulation of Big Sandy's liability for personal injuries and

4              property damage;

5      4.      Declaring that the State, by demanding the revenue sharing provisions described

6  herein, attempted to impose an unlawful tax, fee, charge, or other assessment upon Big Sandy, in

7  violation of its duty under IGRA to conduct Tribal-State compact negotiations in good faith:

8      a.      SDF payments in excess of the amounts necessary to defray the State's costs

9              of regulating Big Sandy's class III gaming activity;

10     b.      RSTF payments in excess of the amounts necessary to allow the distribution

11             of $1.1 million per year to "Non-Compact Tribes" as provided in the 1999

12             Compact;

13     c.      TNGF payments;

14     d.      Penalty charges for late SDF payments; and

15     e.      Penalty charges for late RSTF and TNGF payments;

16     5.      Declaring that IGRA does not authorize Tribal-State compact provisions that

17  require Big Sandy to enter into separate intergovernmental agreements with entities other than the

18  State as a condition of engaging in gaming activities, absent Secretarial approval of a compact

19  amendment, and in excess of the permissible scope of a Tribal-State compact, and the State's

20  demand for such provisions violated the State's duty under IGRA to conduct negotiations in good

21  faith;

22     6.      Declaring that the State violated its obligation under IGRA to negotiate with Big

23  Sandy in good faith for a Tribal-State compact governing class III gaming on the McCabe

24  Allotment;

25     7.      Declaring that the State engaged in delay-based negotiation tactics which violated

26  its duty under IGRA to negotiate in good faith;

27     8.      Ordering the State to resume negotiations with Big Sandy for a Tribal-State

28  compact and to conclude a compact within 60 days of the date of the Court's order, pursuant to 25

U.S.C. § 2710(d)(7)(B)(iii), and thereafter to follow the process prescribed by IGRA if the State and Big Sandy fail to conclude a Tribal-State compact within that period;

        9.      Awarding costs, fees, and expenses to Big Sandy; and

        10.     Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted this 8th day of July, 2022,

John M. Peebles
Patrick R. Bergin
Michael A. Robinson
Tim Hennessy
Steven J. Bloxham
Curtis Vandermolen
PEEBLES KIDDER BERGIN & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone:  (916) 441-2700
Fax:  (916) 441-2067
Email:  jpeebles@ndnlaw.com


By:  *s/ John M. Peebles*
     John M. Peebles
     Attorneys for Plaintiff

COMPLAINT